207 A.2d 389.

Town of North Kingstown *vs.* William P. Robinson, Jr., *Commissioner of Education.*

MARCH 4, 1965.

Present: Condon, C. J., Roberts, Paolino, Powers and Joslin, JJ.

Paolino, J. This petition for a writ of certiorari was brought by the town of North Kingstown to review a decision of the respondent commissioner of education of the state of Rhode Island. The writ was issued and pursuant thereto the pertinent records have been certified to this court.

The cause involves a dispute between the school committee of the town of North Kingstown and James R. Tracy, Jr. Mr. Tracy was engaged under a written contract with the town's school committee to serve as a teacher in the public schools of North Kingstown for the 1963-1964 school year. The contract of employment provided that either party could terminate the engagement at any time "provided that said termination shall not be in violation of existing state laws covering teacher or employee tenure."

The petition alleges that Mr. Tracy did not have tenure under G. L. 1956, §16-13-3.

On January 31, 1964, as a result of an incident which occurred on January 28, 1964, the school committee notified Mr. Tracy that they were terminating his contract of employment in accordance with the termination clause. The committee refused Mr. Tracy's request for a copy of the charges against him and a hearing thereon.

Pursuant to the provisions of §16-39-2, Mr. Tracy appealed the committee's decision to the commissioner of education. After a hearing the commissioner entered a decision holding that under §16-12-6, Mr. Tracy was "entitled to a recitation of the charges on which he was dismissed and to a hearing" thereon by the committee.

From such decision, pursuant to the provisions of §16-39-3, the town of North Kingstown appealed to the state board of education. After hearing the appeal, the board, in accordance with the authority vested in them by §16-1-4(j), entered a decision sustaining the commissioner's decision. Thereafter the instant petition was filed.

Before considering the merits of this petition we shall discuss briefly respondent's argument concerning the "propriety" of the parties in this proceeding. As we have already noted, this cause involves a dispute between the school committee and a schoolteacher and the petition in reality seeks a review of the decision of the board of education. We believe that in the circumstances orderly procedure would have been better served if such a petition had been brought by the school committee with the board of education named as respondents. See *Irish* v. *Collins,* 82 R. I. 348.

In sustaining the commissioner's decision the board relied on the following provision of §16-12-6: "The school committee of any town may, on reasonable notice and a hearing of such teacher, dismiss any teacher for refusal to

conform to the regulations by them made, or for other just cause * * *."

The petitioner contends that this statute does not prohibit the incorporation of a termination clause into a teacher's annual contract and that the only statutory prohibition against such a clause appears in §16-13-3 which applies only to teachers who have acquired tenure. The petitioner also contends that the effect of holding this termination clause invalid would be to create tenure for one year for all probationary teachers.

The narrow issue presented for our determination is whether a teacher on an annual contract under §16-13-2 may be dismissed within the contract year without being informed of the charges against him and without an opportunity to be heard thereon.

Before the enactment of public laws 1946, chap. 1775, the teachers' tenure act (now G. L. 1956, chap. 13 of title 16), school committees could appoint teachers at will and for shorter periods than on the basis of an annual contract. The title of chap. 1775 is: "An Act To Guarantee And To Improve The Education Of Children And Youth In This State By Providing Continuing Teaching Service." Section 2 thereof reads as follows:

> "Teaching service shall be on the basis of an annual contract, except as hereinafter provided, and such contract shall be deemed to be continuous unless the governing body of the schools shall notify the teacher in writing (on or before March 1) that the contract for the ensuing year will not be renewed."

Mr. Tracy was a teacher engaged on an annual contract basis within the meaning of §16-13-2.

In our opinion the pertinent portion of §16-12-6 applies to a probationary teacher. We are not deciding that a probationary teacher cannot be dismissed during the contract year. We do hold, however, that this statute clearly grants a probationary teacher a right to a hearing and that implicit

in such right is a right to a copy of the charge or charges against such teacher prior to the hearing before the school committee. It is our opinion, therefore, that the board did not err in sustaining the commissioner's decision.

The petition for certiorari is denied and dismissed, the writ heretofore issued is quashed, and the records certified to this court are ordered returned to the respondent with our decision endorsed thereon.

*Weller & Wilkins, S. Everett Wilkins, Jr.,* for petitioner.

*J. Joseph Nugent,* Attorney General, *Joseph L. Breen,* Chief Special Counsel, for respondent.

208 A.2d 105.

OPINION TO THE GOVERNOR.

MARCH 10 as of MARCH 9, 1965.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Joslin, JJ.

OPINION to the governor in relation to limitations of referendum question submitted to electorate and which pertained to action of general assembly in guaranteeing payment of bonds of Rhode Island Turnpike and Bridge Authority. Question propounded by governor answered in following opinion.

March 9, 1965

To His Excellency John H. Chafee
    Governor of the State of Rhode Island
        and Providence Plantations

We have received from Your Excellency a request for our written opinion in accordance with the provisions of section 2 of article XII of amendments to the constitution of this state upon the following question of law:

> "At the general election held on November 3, 1964, the people of the State voted in favor of the State guaranteeing not exceeding $17,500,000 of the bonds required for financing the construction of the Newport bridge. However, I am advised that a pledge of the tolls to be derived from the Mount Hope bridge is also necessary to finance the construction of the Newport bridge and that the following question must be answered before the Authority can issue and market its bonds for this purpose:

> "Do the provisions of Sections 24-12-9(g), 24-12-9(i), 24-12-26 and 24-12-40B of the General Laws of Rhode Island of 1956, as amended, to the effect that the Rhode Island Turnpike and Bridge Authority is authorized and empowered

>> "(a) to combine for financing purposes the Newport bridge and the Mount Hope bridge,

>> "(b) to fix and revise from time to time and to charge and collect tolls for the use of the Newport bridge and the Mount Hope bridge, and

"(c) following the issuance of 'Newport Bridge Bonds-Guaranteed by the State' pursuant to the provisions of said Section 24-12-40B and the favorable vote of the people of the State at the general election held on November 3, 1964 pursuant to Section 18 of Chapter 165 of Public Laws of 1963 and issuance of revenue bonds for paying the balance of the cost of the Newport bridge pursuant to Section 24-12-18 of the General Laws of Rhode Island of 1956, as amended, to set aside at such regular intervals as may be provided in the resolution authorizing said bonds the tolls and all other revenues derived from the Mount Hope bridge and the Newport bridge, except such part thereof as may be necessary to pay the cost of maintenance, repair and operation and to provide reserves therefor, in special funds for paying the interest on and the principal of said bonds all as provided in said Section 24-12-40B,

"violate Section 1 of Article XXXI of the Amendments to the Constitution of Rhode Island as incurring a debt of the State in excess of fifty thousand dollars or as pledging the faith of the State for the payment of the obligations of others, without the express consent of the people?"

Not to extend this opinion by setting out the specific language of the several sections of the general laws, as amended, to which our attention is directed, we respectfully refer Your Excellency and interested parties to the cited sections as they appear in the bound volumes of the general laws and relevant supplement.

Suffice it to observe that the provisions in question purport to authorize the Rhode Island turnpike and bridge authority, hereafter called the authority, to assume jurisdiction of and over the Mount Hope bridge, the proposed Newport bridge and interrelated facilities for the purpose of financing the construction of said Newport bridge; to fix and regulate tolls on any such facilities so combined; to provide for and regulate accessory facilities, such as

gasoline service stations, restaurants and the like; and to issue revenue bonds of the authority which purport not to bind the faith of the state as well as the issuance of $17,-500,000 to which the faith of the state is purportedly pledged by reason of the vote on the referendum submitted to the people at the last general election.

The short answer to your question is that the specific provisions to which our attention is directed would be violative of article XXXI of the amendments, section 1, absent the assent of the people. See *Opinion to the Governor,* 97 R. I. 200, 196 A.2d 829, and *Opinion to the Governor,* 94 R. I. 464, 181 A.2d 618.

However, we construe the thrust of the question to be whether such provisions were validated by the approving vote of the people on the referendum in question at the general election held November 3, 1964. The question appearing on the ballot is as follows:

"Newport Bridge Guarantee Of Bonds Under Turnpike And Bridge Authority Act (Chapter 165 - Public Laws of 1963)

" 'Shall the action of the general assembly by an act passed at the regular session, 1963, providing that the payment of the principal of and the interest on bonds of the Rhode Island Turnpike and Bridge Authority in an aggregate principal amount not exceeding $17,-500,000. to be issued under the provisions of Chapter 12 of Title 24, General Laws of Rhode Island, 1956, as amended by said act, and by chapter 219, of the public laws, 1960, and chapter 210 of the public laws, 1962 for paying a part of the cost of the Newport bridge shall be guaranteed by the state and the faith and credit of the state pledged in accordance with said act to insure such payment, be approved?' "

It may be reasonably stated that in voting on the foregoing question a majority of the electors intended to give their consent to the pledging of the state's faith for the payment of principal and interest of $17,500,000 in bonds, the proceeds of which were to be applied to the construction

of the Newport bridge, so called. Whether the jurisdiction of the authority to issue such bonds and the provisions established by the general assembly in connection therewith as well as the right of the authority to issue an additional series of revenue bonds in a total amount of millions of dollars in excess of the authorized $17,500,000, the principal and interest of which would be met from the imposition of tolls on the Mount Hope bridge and/or other facilities until such revenue bonds were discharged, is another question.

We find that §24-12-9(g), as amended, provides for the right of the authority "to combine for financing purposes the Newport bridge, the Mount Hope bridge, the turnpike and any additional facility or facilities, or any two (2) or more of such projects * * *."

Paragraph (i) of §24-12-9 further provides for the jurisdiction of the authority "to fix and revise from time to time, subject to the provisions of this chapter, and to charge and collect tolls for transit over the turnpike and the several parts or sections thereof, and for the use of the Newport bridge, the Mount Hope bridge, and any additional facility financed under the provisions of this chapter * * *."

It is significant that the financing to which reference is made in the foregoing paragraphs relates not to the discharge of principal and interest of the $17,500,000 specified in the referendum of which the electorate had notice and gave their assent, but rather it is concerned with the discharge of principal and interest on certain revenue bonds to be issued by the authority apart from the $17,500,000 issue. These revenue bonds are allegedly authorized by §24-12-18 as amended. The expressed exemptions of the state from the obligation for the discharge of principal and interest thereon are set forth in §24-12-7 as amended, and read as follows:

"Revenue bonds issued under the provisions of this chapter shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision, but shall be payable solely from the funds provided therefor under the provisions of this chapter. All such revenue bonds shall contain on the face thereof a statement to the effect that neither the state nor the authority shall be obligated to pay the same or the interest thereon except from the funds provided therefor under the provisions of this chapter and that neither the faith and credit nor the taxing power of the state or of any political subdivision thereof is pledged to the payment of the principal of or the interest on such bonds; provided, however, that any bonds issued under the provisions of §24-12-40B of this chapter shall contain on the face thereof the statement required by said §24-12-40B."

Said provisions as amended and §24-12-21 which provide for the retirement of the revenue bonds are incorporated by reference in §24-12-40B, one of the statutory provisions singled out by Your Excellency.

Thus, although the faith and credit of the state are purportedly not pledged to the discharge of the obligations incurred by the issuance of the authority's revenue bonds, the property of the state is pledged. In *Opinion to the Governor*, 54 R. I. 45, at page 50, this court stated:

"Unless the State pays the debts for which its property is pledged, to release the same from the lien created upon it through the Act of the corporation, the property will be lost to the State. In substance there is no difference between the obligation of the State to pay its direct debts and its duty to redeem its property pledged as security for money expended for its benefit. The will of the people, as expressed in their constitution, may not be defeated through the formation of a corporation to accomplish by indirection that which may not be done directly. The practical effect is the same whether such obligations arise through the pledge of the property of the State or by express promise. In

either event the obligation must be paid with the money of the people, and incurrence of such obligation, unless consented to by them, is contrary to said section 13 of Article IV."

We might note that article XXXI, section 1, of the amendments is couched in substantially the same language as article IV, section 13, which it replaces, and is in part as follows:

"The general assembly shall have no powers, hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion; nor shall they in any case, without such consent, pledge the faith of the state for the payment of the obligations of others."

Indeed it is not an exaggeration to say that the specific provisions of chapter 12 of title 24 as amended, to which our attention has been directed, incorporate by reference every provision of that chapter. From our reading of the act in its entirety it appears that the $17,500,000 to be raised by the issuance of bonds, the authorization for which was approved by the people at the last general election, will be discharged by proceeds raised from the imposition of tolls, but they are to be applied first to the maintenance and operation of the bridges, secondly to the discharge of the revenue bonds, and not until then to the discharge of the obligation of $17,500,000. Section 24-12-40B as amended.

Manifestly then, the proceeds flowing from the imposition of tolls by the authority are to be used not only to discharge the $17,500,000, an obligation of which the people had notice, but also and primarily to the discharge of the authority's obligation incurred by the issuance of its revenue bonds. This latter obligation is that of "others" within the meaning of section 1 of article XXXI of the amendments to the constitution. It is clear then that the obligation of the authority created with the issuance of its reve-

358

nue bonds was not assented to by the people. This is necessarily so unless the limited reference to the pertinent legislation in the question submitted to the people constitutes sufficient notice of the jurisdiction purportedly vested in the authority by the legislature pursuant to the provisions of the statutes merely cited in the question as it appeared on the ballot.

The overriding question then, the determination of which will control the answer to Your Excellency's inquiry, may be stated thusly: Did the bare reference to "Chapter 12 of Title 24, General Laws of Rhode Island, 1956, as amended by said act, and by chapter 219, of the public laws, 1960, and chapter 210 of the public laws, 1962," in the question submitted to the people at the general election held November 3, 1964 entitled "Newport Bridge Guarantee Of Bonds Under Turnpike And Bridge Authority Act," furnish to the electorate voting thereon sufficient information to alert them that, in addition to pledging the faith of the state in the sum of $17,500,000, the general assembly was asking for their assent to the assumption of an obligation of many more millions of dollars, the discharge of which was guaranteed by a pledge of state property? It is our opinion that the question as stated on the ballot did not contain sufficient information to inform the electorate adequately of the decision they were being called upon to make.

The powers delegated by the people to the general assembly are contained in article IV of the state constitution as amended. Section 1 thereof declares: "This Constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void. The general assembly shall pass all laws necessary to carry this Constitution into effect."

Section 10 of article IV expressly confers on the general assembly all of the powers enjoyed by the Rhode Island

legislature prior to the enactment of the constitution, but concludes "unless prohibited in this Constitution." It was by the prohibition contained in section 13 of article IV, now section 1 of article XXXI of the amendments, that the people in adopting their constitution not only placed a limitation on the powers to be exercised by their duly-elected senators and representatives, but affirmatively made specific provision for the obtaining of their assent as an essential element to the validity of certain legislative proposals.

In our opinion the people's participation in legislation regulated by section 1 of article XXXI of the amendments is intended to be something more than assent by implication. The then sitting justices of this court had occasion to pass on the paramount question before us when asked to give their opinion on legislation concerning the application of funds raised by the issuance of bonds for the construction of a state normal school and a state armory. *In re State House Fund*, 19 R. I. 393. The pertinent questions were stated as follows:

> "*Third*: In case the proper authorities should determine to issue bonds to provide funds to pay for the land required for and the cost of erecting the Rhode Island State Normal School and the proposed State Armory in the City of Providence, can provision be made in the acts authorizing said bonds, to repay into the General Treasury of the State, such sums of money as have already been appropriated by the Legislature and expended by the Rhode Island Normal School Commission and the Commission to erect a State Armory in the City of Providence, for the purposes contemplated in the acts creating such commissions?

> "*Fourth*: Has the Legislature power to authorize said repayment from the proceeds of said Normal School and said State Armory bonds, or must the intention to make said repayment be specified in the act creating said bonds to be submitted to the electors?"

The problem with which the legislative and executive authorities were concerned is obvious from the very nature of the questions and in their opinion the then justices of this court stated at page 396:

"We reply to the third and fourth questions propounded that, in case it is determined to issue bonds for the purposes mentioned in the third question, we are of the opinion that it will not be enough to provide in the acts authorizing the submission of propositions to the people for the repayment into the General Treasury of the moneys already appropriated by the Legislature, and expended by the Rhode Island Normal School Commission and the Commission to erect the State Armory, but that the proposition submitted to the people to authorize the loans should also contain authority for such repayment; that while it may not be necessary to specify particularly the repayment into the General Treasury, the proposition should be so framed as to evince an intention that the loan authorized is to be used for the payment of moneys already expended, or, as in the case of the proposition for creating the State House loan, to leave an unexpended surplus in the General Treasury, which of course would be subject to the action of the General Assembly."

It cannot be reasonably contended here that merely by incorporating the title and/or chapters of legislation which purport to pledge the property of the state to the discharge of the authority's obligation in an aggregate sum of millions of dollars, the assent of the people has been obtained so as to validate the specific provisions of the legislation cited in the question. As previously mentioned, the people in voting thereon were aware of the obligation they were assuming insofar as the $17,500,000 was concerned, but they had no knowledge that their property was being pledged to secure the discharge of the authority's obligation for many millions more.

In our opinion, therefore, the question propounded by Your Excellency must be answered in the affirmative.

Francis B. Condon
Thomas H. Roberts
Thomas J. Paolino
William E. Powers
Alfred H. Joslin

208 A.2d 124.

BUTLER AUTO SALES, INC. *vs.* ALBERT E. SKOG.

MARCH 10, 1965.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Joslin, JJ.

CONDON, C. J. This is an action of assumpsit which was brought here by the defendant's bill of exceptions and was originally considered by us on the plaintiff's motion to establish the truth of the transcript. The motion was grounded on its alleged incompleteness caused by the court stenographer omitting therefrom the defendant's stipulation as to certain evidentiary matters. We granted the motion and deferred consideration of the merits of the exceptions until the defendant submitted "so much of the stenographic report as has been omitted * * *." See *Butler Auto Sales, Inc.* v. *Skog,* 98 R. I. 63, 67, 199 A.2d 597, 599. Pursuant thereto such omitted portion of the transcript was thereafter duly presented and the parties were given permission to withdraw their briefs previously filed and present new briefs to meet the issues raised by the transcript as thus completed. See *Butler Auto Sales, Inc.* v. *Skog,* 98 R. I. 63, 67, 200 A.2d 700.

It appears from such completed transcript that the case was tried to a justice of the superior court sitting without a jury largely on facts stipulated by defendant and resulted in a decision for plaintiff for $500. The defendant prosecuted a bill of exceptions containing six exceptions but he has expressly waived those numbered 3, 4 and 5. Under his first exception he contends the trial justice erred in denying his motion to strike certain testimony given by a witness in his direct examination. At that time he made no objection thereto but later when on cross-examining the witness he was precluded from inquiring into the same matter he moved that such testimony given in direct examination be stricken. The trial justice denied the motion on the ground that it came too late. There was no error. *Perry* v. *New England Transp. Co.,* 71 R. I. 352. Exception No. 1 is therefore overruled.

At the conclusion of a series of questions to which defendant's counsel had neglected to object, he asked leave

364

*Sanford H. Gorodetsky* for plaintiff.

*Pontarelli & Berberian, Aram K. Berberian,* for defendant.