225 A.2d 766.

CHARTIER REAL ESTATE COMPANY, INC. *et al. vs.*
JOHN H. CHAFEE, *Governor, et al.*

JANUARY 16, 1967.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

PAOLINO, J. The plaintiffs brought this complaint to permanently enjoin the defendants from proceeding to take by eminent domain certain real estate owned by them. In addition they sought a judgment declaring P. L. 1964, chap. 169,[1] invalid on constitutional grounds. The defend-

[1]Although the prayer refers only to chap. 169, it appears from the allegations in the complaint that plaintiffs challenge the validity of P. L. 1964, chap. 174, as well. In the circumstances we shall treat the prayer as a demand for a judgment declaring either or both as invalid.

ants filed a motion to dismiss alleging that the complaint failed to state a claim against them upon which relief could be granted. After a hearing in the superior court on the complaint, as amended, and the motion to dismiss, the trial justice entered a judgment denying the plaintiffs' prayers and granting the defendants' motion. The cause is before us on the plaintiffs' appeal from such judgment.

We note at the outset that defendants have not questioned the propriety or necessity of including the governor as a party defendant and therefore we do not pass on the question. However this is not to be considered precedential.

The complaint contains the following pertinent allegations. The defendants, in their official capacities, made it known to plaintiffs that they intend to take certain land owned by them on behalf of the state under the provisions of P. L. 1964, chap. 174, which enacts chap. 4 of title 32 of G. L. 1956, known as the "Green acres land acquisition act of 1964," and P. L. 1965, chap. 137, which establishes the department of natural resources. The defendants intend to use for the payment of said land the proceeds of the sale of bonds in the amount of $5,000,000 purportedly authorized under the provisions of chap. 169, and purportedly approved by vote of the people at the general election held in November 1964. Chapter 169 provided for the submission at such election of the following proposition to the people for their approval or rejection:

> "Shall the act passed by the general assembly at the January session, 1964, entitled 'An act authorizing the issuance of bonds and notes for the acquisition and development of lands for recreation and conservation purposes and governing the expenditure of money for such purposes ($5,000,000)' be approved?"

In paragraph 4 of the complaint plaintiffs allege that the vote purporting to approve the issuance of the bonds, and the issuance of such bonds, are invalid, and in paragraphs 5 and 6 they challenge the validity of chaps. 169 and 174

on constitutional grounds. Paragraphs 4, 5 and 6 contain the specific grounds on which plaintiffs rely and which they have incorporated in their briefs.

The defendants base their motion to dismiss on specific grounds which we shall discuss together with plaintiffs' contentions. Before doing so we refer briefly to the pertinent statutes.

Chapter 169 was passed by the general assembly at the January session, 1964. The proposition provided for therein was approved by the people at the general election held in November 1964. If valid, the act will provide the funds to complement chap. 174, which provides for the acquisition of lands for recreation and conservation purposes. Public laws 1965, chap. 137, establishes a department of natural resources and defines its function.

The parties have briefed and argued their respective contentions under three main points and for convenience we shall treat them in like manner. The plaintiffs contend that either or both of the statutes in question, namely, chaps. 169 and 174, are invalid.

Under point I they raise the issue whether the proposition as stated on the ballot sufficiently informs the people of the nature and extent of the state borrowing authorized by chap. 169 so as to conform with the provisions of art. XXXI, sec. 1, of the amendments to the Rhode Island constitution, which reads as follows:

> "The general assembly shall have no powers, hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion; nor shall they in any case, without such consent, pledge the faith of the state for the payment of the obligations of others. This section shall not be construed to refer to any money that may be deposited with this state by the government of the United States."

Before considering the specific questions raised by plaintiffs, it may be well to point out that since they challenge the validity of the statutes in question on constitutional grounds, they have the burden of proving unconstitutionality beyond a reasonable doubt, *Gomes* v. *Bristol Mfg. Corp.,* 95 R. I. 126, 131, and *State* v. *Kofines,* 33 R. I. 211, 218, and they must overcome the presumption of constitutionality in favor of the acts, *State* v. *Kofines, supra,* at 218. See also annotation in 16 A.L.R.2d, pages 515 to 579, on the question of presumptions and burden of proof.

There is no dispute between the parties with respect to the standards applicable in determining whether the mandate of art. XXXI, sec. 1, has been satisfied. In recent years the justices of this court have stated the rule in a series of advisory opinions which they were requested to give under the provisions of sec. 2 of art. XII of amendments to the constitution of this state.

In *Opinion to the Governor,* 88 R. I. 202, at 206, in discussing the intendment of art. XXXI, sec. 1, they stated: "This consent must of course be an intelligent consent. That is, the people must be clearly informed of the nature and extent of the pledge which the general assembly proposes to authorize." In referring to the statute under consideration in that opinion they said:

> "We think the question to be propounded to the people in accordance with the provisions of section 1 of the act is sufficiently informative to meet such requirement and is a substantial compliance with the constitutional prohibition of article XXXI, section 1, of amendments."

And in *Opinion to the Governor,* 100 R. I. 175 at 180, 212 A.2d 64 at 67, the justices said:

> "* * * to meet the constitutional requirement, the submission must clearly disclose to the ordinary voter that an approval will empower the Authority to pledge the credit of the state and the extent to which that credit may be pledged."

See also *Opinion to the Governor*, 101 R. I. 329, 332, 223 A.2d 76, 78. We agree with the rule as stated by plaintiffs, namely, that a proposition submitted on referendum must be couched in language which will clearly apprise the ordinary voter of the questions involved. Our only concern here is with the application of this established principle to the proposition involved in this case.

The thrust of plaintiffs' first contention under point I is that the proposition is vague and uncertain in its language and does not clearly disclose to the electorate whether or not the bonds to be issued are limited to $5,000,000; and whether or not the expenditures to be made are limited to such amount. They argue in substance that the proposition, as stated, was not clear enough to inform the people of the nature and extent of the pledge which the general assembly proposed to authorize, that is, of the purpose for which their approval was sought by chap. 169 and the limit of state borrowing to accomplish that purpose. We do not agree with plaintiffs' contention.

There is no merit in plaintiffs' contention that the proposition is bare of any statement as to the amount of the bonds to be sold. We agree with the conclusion of the trial justice with reference to the last part of the proposition which reads " '* * * and governing the expenditure of money for such purposes ($5,000,000.00)' be approved?" He said: "Since this is the only amount mentioned, there can be no question but that this would be clearly understood by the electorate as the limit of the amount that would be authorized and to which they gave an intelligent consent."

Nor is there any merit in their contention that the phrase "for such purposes" is not clear. The purposes of the act are expressly set forth in the proposition. The plain and unambiguous language therein states that the legislature is asking the people to approve its proposal to commit the state to borrow up to $5,000,000 "for the acquisition and

development of lands for recreation and conservation purposes * * *." The inclusion of the figure $5,000,000 within the parentheses is a clear indication that this amount represents the extent of the borrowing, from whatever source, for which the approval of the people is being sought. There being no ambiguity in the language of the proposition, there is no necessity for invoking rules of judicial construction. *Allen* v. *Rhode Island State Board of Veterinarians*, 72 R. I. 372, 378. In our judgment the ordinary voter looking at the proposition could easily understand the nature of the matter being voted upon and the limit of the borrowing proposed by the act and could therefore give an intelligent consent thereto.

*Board of Education* v. *City of Hackensack*, 63 N. J. Super. 560, cited by plaintiffs, is of no help to them. The proposition in that case did not relate to the question whether the electorate was informed as to the limit of the borrowing or expenditures authorized by any act. The proposition there asked the people to approve an expenditure of funds for the conversion of a school, when in fact the Board of Education intended to use a substantial amount of the funds authorized to construct an addition to an existing school.

Cases entitled *Opinion to the Governor*, 99 R. I. 351, 208 A.2d 105 (the Turnpike opinion), and *Opinion to the Governor*, 100 R. I. 175, 212 A.2d 64 (the Industrial Building Authority opinion), on which plaintiffs rely, are likewise of no help to them because in those cases the justices of this court found a failure to inform the electorate of the nature and extent of the state's pledge of credit. As the justices said in *Opinion to the Governor*, 101 R. I. 329 at 332, 223 A.2d 76, at 78, in reference to the two opinions above:

> "In the Turnpike opinion we faulted the sufficiency of the proposition submitted to the people because there was nothing in the language of the proposition

to alert them that, in addition to pledging the credit of the state in the sum of $17,500,000, the general assembly was asking for their assent to the assumption of many more millions of dollars, the discharge of which was guaranteed by a pledge of state property. We found the proposition which purported to expand the powers of the Industrial Building Authority to be deficient because, while it did inform the voter that his assent would permit the Authority to increase the aggregate amount of mortgages insured by it from $30,000,000 to $40,000,000, it failed to convey to the voter the information that the state's credit would be pledged for this additional $10,000,000."

We agree with the statement of defendants that none of these opinions suggests that substantive provisions in the pertinent statutes be included in the proposition submitted to the people. As we have stated it is only necessary that the purpose and extent of the pledge of state credit be made clear to the ordinary voter so that he may give an intelligent consent to the proposition.

The plaintiffs next contend that chap. 169 is invalid because the proposition did not disclose to the electorate that the act authorized the director of administration, on behalf of the state and with the approval of the governor, to accept assistance from and to participate with the federal government in carrying out its purposes. They concede that the electorate's approval of acceptance of federal aid is unnecessary in the absence of an independent reason for seeking such express consent, but they argue that once a statute is required to be placed on the ballot, for whatever reason, the electorate is entitled to a clear and thorough exposition of the entire statute, including those portions otherwise within the competence of the legislature.

The answer to this question is found in the language of art. XXXI, sec. 1, of amendments. We agree with the statement of the trial justice that *"Article XXXI, Section 1 of Amendments* requires the consent of the people to incur

state debts in amounts exceeding $50,000. and not for authorization to participate with or accept Federal assistance * * * ." We adopt the statement of the trial justice that:

> "This is not a matter on which the consent is required, any more than it would be required on the question as to whether the borrowing shall be from banks, bonding or insurance companies or private sources. All that is required is that the purposes and that the amount of borrowing authorized be specifically and clearly set forth, so that the people 'be clearly informed of the nature and extent of the pledge which the general assembly proposes to authorize.'"

The plaintiffs have called no authorities to our attention nor have we been able to find any as a result of our own research holding that an entire statute must be contained in a proposition seeking the approval of the people for authority to borrow money or pledge the faith of the state for the payment of the obligations of others. In our judgment the proposition presented is "sufficiently informative" to permit the people to give their intelligent consent and is in "substantial compliance" with the requirements of art. XXXI, sec. 1, of amendments. *Opinion to the Governor*, 88 R. I. 202, 206.

The plaintiffs' next contention under point I is that the proposition did not disclose to the electorate that sec. 10 of chap. 169 authorizes the director of administration, with the approval of the governor, to incur loans from the federal government unlimited in amount and therefore the act is invalid because the express consent of the people was not given thereto. We do not agree with this contention.

Section 10 reads as follows:

> "Federal assistance.—In carrying out this act, the director of administration is authorized to cooperate with and assist the federal government in all matters in furtherance of the purposes of this act, and on

behalf of the state, with the approval of the governor, to apply for and accept any federal funds or federal assistance which may become available therefor, whether in the form of loans, advances, grants, subsidies or otherwise, to accept the provisions of any federal legislation therefor, to enter into contracts in connection therewith, and to act as agent for the federal government in connection therewith or to designate a subordinate so to act. Where federal funds or assistance is made available, the project shall be carried out in accordance with applicable federal law, the rules and regulations thereunder and the contract or contracts providing for federal funds or assistance notwithstanding any contrary provisions of state law."

We are satisfied from a reading of the entire act that chap. 169 does not authorize any borrowing by the state in excess of $5,000,000, whether the borrowing is from the federal government or any other source. Sections 1 and 2 of the act clearly fix the limit of borrowing at $5,000,000. Section 10 is prefaced by the words "In carrying out this act" and refers to "all matters in furtherance of the purposes of this act * * *." The act must be read in its entirety, *Bijou Amusement Co.* v. *Toupin*, 63 R. I. 503, 509, and when so read reveals a legislative intent indicating that sec. 10 is limited and circumscribed by the language of secs. 1 and 2. This is supported by the use of the words in sec. 10 "In carrying out this act" and by the reference therein to "all matters in furtherance of the purposes of this act * * *."

It is true, as plaintiffs argue, that legislation of this character must be strictly construed. *Opinion to the Governor,* 90 R. I. 135, 138. So construed, chap. 169 must be read to limit federal borrowing under sec. 10 by the words of enumeration ($5,000,000) appearing in secs. 1 and 2 of the act. *Id.* at 139.

Although plaintiffs did not raise the specific issue in their complaint, they have included in their brief a chal-

lenge to the validity of chap. 174 based on substantially the same grounds on which they challenged the validity of sec. 10 of chap. 169. While it is true, as defendants point out, that plaintiffs' argument with respect to chap. 174 is not relevant to paragraph 4(c) of their complaint, which relates solely to chap. 169 and the ballot proposition therein set forth, nevertheless, because of the public interest involved in this case, we believe it is our duty to consider this question now.

General laws 1956, §32-4-4, as enacted by P. L. 1964, chap. 174, contains language substantially similar to sec. 10 of chap. 169, whereby the director of administration, with the approval of the governor, is authorized to apply for federal assistance

> "which may become available for the purposes of this act, whether the same be in the form of a loan or grant or otherwise, to accept the provisions of any federal legislation or regulations therefor, to enter into contracts in connection therewith and to act as agent for the federal government in connection therewith or to designate a subordinate so to act. To obtain federal assistance the director is authorized to comply with any federal law, rules and regulations thereunder, and to meet such federal requirements as may be made conditions precedent to receiving federal assistance."

The plaintiffs contend that chap. 174 is invalid because it authorizes borrowing with no limit and was at no time submitted to the people for their consent as required by art. XXXI, sec. 1, of amendments. If chap. 174 stood alone, there would be merit in plaintiffs' position. But chap. 174 must be read together with chap. 169; the one complements the other, the latter providing the money and the former the procedures for carrying out the stated purpose of acquiring and developing lands for recreation and conservation purposes. The plaintiffs, in their brief, concede that chaps. 169 and 174 are intimately connected and that one would be useless without the other. Section 32-4-4 gives

the director of administration no more authority than he already has by virtue of sec. 10 of chap. 169.

Since we have already upheld the validity of sec. 10 of chap. 169, the determination of the validity of §32-4-4 will be of no help to plaintiffs. In the circumstances we do not pass on the question because, as the court said in *State* v. *Berberian,* 80 R. I. 444, 445: "* * * this court will not decide a constitutional question raised on the record when it is clear that the case before it can be decided on another point and that the determination of such question is not indispensably necessary for the disposition of the case." The instant case can be decided without passing on the constitutionality of §32-4-4. Moreover, even if this section were declared invalid, it does not follow that the remainder must fall because this section is not indispensable to the other parts of the act. *The Narragansett Indians,* 20 R. I. 715, 765.

The plaintiffs' final argument under point I is that the proposed authorization is invalid because the proposition did not disclose to the electorate that chap. 169 provided for appropriating annually a sum sufficient to pay the interest due each year on bonds and notes issued thereunder, out of any money in the treasury not otherwise appropriated, thereby incurring state debts over and above the $5,000,000 of bonded indebtedness. They argue further that such sum will exceed $50,000 and therefore required the express consent of the people under art. XXXI, sec. 1, of amendments.

Section 8 of chap. 169 provides as follows:

> "Amortization.—To the extent the same is not otherwise provided, a sum sufficient to pay the interest and principal due each year on bonds and notes hereunder is hereby annually appropriated, out of any money in the treasury not otherwise appropriated."

The plaintiffs contend that future indebtedness resulting from interest accruing on outstanding bonds should be

included within the debt limitation prescribed by art.
XXXI. The defendants, on the contrary, argue that the
word "debts," as used in art. XXXI, means principal in-
debtedness and does not refer to future, unearned interest
on such principal.

The precise question presented for our consideration and
determination is whether the word "debts" as used in art.
XXXI means principal indebtedness alone, or whether it
refers to future, unearned interest as well. This question
is one of first impression in this state. However, it appears
that the overwhelming weight of authority elsewhere holds
that the word debt or words of similar import do not in-
clude unaccrued interest on bonds or notes. See Annotation
in 100 A.L.R. 610 citing many of the following authorities:
*O'Rear* v. *Sartain,* 193 Ala. 275; *Epping* v. *City of Colum-
bus,* 117 Ga. 263; *Wade* v. *East Side Levee & Sanitary Dis-
trict,* 320 Ill. 396; *Brown* v. *Guthrie,* 185 Ind. 669; *City of
Ashland* v. *Culbertson,* 103 Ky. 161; *Finlayson* v. *Vaughn,*
54 Minn. 331; *Carlson* v. *City of Helena,* 39 Mont. 82;
*Continental Securities Co.* v. *New York Central & H.R.R.,*
217 N. Y. 119; *Schieber* v. *City of Mohall,* 66 N. D. 593;
*Pennsylvania Power & Light Co.* v. *City of Bethlehem,* 323
Pa. 313; *Williams* v. *City of Rock Hill,* 177 S. C. 82; *Her-
man* v. *City of Oconto,* 110 Wis. 660.

See also 15 McQuillin, Municipal Corporations (3d ed.),
§41.27, p. 359, where the author states the rule as follows:

"Interest is not a debt, within the meaning of debt-
limit provisions, until it is earned and becomes due.
And in determining whether an indebtedness will be
created in excess of the debt limit, unearned interest
cannot be added to the principal. The authority grant-
ed by the constitution or statute to contract a debt
refers to the amount of the debt at the date at which
it is created, and has no reference to the amounts of
interest which accrue thereafter. On the other hand,
interest which has become due and payable is a part

of the existing indebtedness, in figuring the total of municipal indebtedness."

We believe that the reasoning of the court in *Metropolitan Water District of So. Cal.* v. *Heilborn,* 167 Cal.App.2d 190, applies with equal force to the question before us. In that case the court said at page 192:

"The question as to whether the word 'indebtedness' as used in constitutional and statutory debt limitation provisions includes or excludes interest to accrue on bonds has never been passed upon by the courts of this state. However, the overwhelming authority elsewhere is to the effect that the word does not include interest to accrue on the bonds. The rationale of the authorities so declaring is well summarized in annotation in 100 American Law Reports 610, as follows: 'The interpretation given to the words "debt," or "indebtedness," as used in constitutional or statutory provisions governing the limitation of the amount to which a city may become indebted, may be said to be the deciding factor in determining whether interest on its indebtedness is to be considered as a part of the total indebtedness of a municipality.

" 'Nearly all jurisdictions incline toward the view expressed by the court in *Epping* v. *Columbus* (1903), 117 Ga. 263, 43 S.E. 803, that the word "debt," when appearing in a constitution, is to be taken in its ordinary, natural, common-sense, popular meaning, unless the context requires that it should be treated as used in a technical sense. "If a person unversed in the technical niceties of the law is asked what is the amount of his debts, his answer to the question in every instance would be an amount which would represent the present liability that he was under at the moment the question was answered. A farmer who had been so unfortunate as to be compelled to place a long loan upon his farm, if asked what was the amount of the debt upon his farm, would unhesitatingly answer by giving an amount which would represent the principal of the debt and any interest that was past due and payable at the time the inquiry was made. One who,

in making a return of his property for taxation, is required to state to the tax receiver the amount of solvent debts due him, would not, in the case of a perfectly solvent debt, consider that he was under a moral obligation to return for taxation the value of the debt at any higher amount than one which would represent the principal and any interest that was past due at the time the return was made. It is useless to multiply illustrations. The 'debt' of an individual or a corporation or the public, in its usual and popular sense, means the amount for which the individual or corporation or the public would be presently liable if called upon to discharge the obligation. The law deals at all points with the man of ordinary prudence and average capacity as the standard, for the simple reason that communities and commonwealths are made up of persons of this class." ' "

It is true, as plaintiffs point out, that in *Heilborn, supra,* the issue was whether certain bonds created an indebtedness in excess of a statutory limit. Nevertheless, as we have already stated, the reasoning of the court in that case applies here.

We are persuaded by the soundness of the majority view and hold that the word "debts" as used in art. XXXI means principal indebtedness and does not refer to future, unearned interest on such principal. On the view we take, *Opinion to the Governor,* 99 R. I. 351, 208 A.2d 105, and *Opinion to the Governor,* 100 R. I. 175, 212 A.2d 64, relied on by plaintiffs in support of their position on this issue, do not help them.

In point II plaintiffs contend that chaps. 169 and 174 are invalid because in neither of these acts is the faith and credit of the state pledged to make payments to them of compensation for property taken in the event that the value of their property, together with the value of other property taken or to be taken under those acts, shall exceed the amount of funds made available from the appropria-

tions made in chap. 174 and from the sale of bonds provided for in chap. 169.

We note at the outset that, although chaps. 169 and 174 are intimately connected and complement each other, they are separate and independent acts. Chapter 169 provides the medium for borrowing and other financing aspects but contains no provision for eminent domain. Chapter 174, which is entitled the "Green acres land acquisition act of 1964," provides all the eminent domain procedures.

The issue raised by this contention is whether under chap. 174 the faith and credit of the state are pledged to secure payment for land of plaintiffs if and when it is taken by eminent domain under such act so as to conform with the requirements of art. I, sec. 16, of the constitution of this state which reads as follows: "Private property shall not be taken for public uses, without just compensation."

In our opinion this question must be answered in the affirmative.

We refer briefly to the constitutional principles governing the exercise of eminent domain. In *Joslin Mfg. Co.* v. *City of Providence*, 262 U. S. 668, 677, the court said:

> "It has long been settled that the taking of property for public use by a State or one of its municipalities need not be accompanied or preceded by payment, but that the requirement of just compensation is satisfied when the public faith and credit are pledged to a reasonably prompt ascertainment and payment, and there is adequate provision for enforcing the pledge."

The same rule applies to eminent domain proceedings under art. I, sec. 16, of the state constitution. *East Shore Land Co.* v. *Peckham*, 33 R. I. 541; *City of Newport* v. *Newport Water Corp.*, 57 R. I. 269. In *City of Newport*, *supra*, at page 277, the court stated the rule as follows:

> "* * * property may not be taken without the payment of or securing the payment of just compensation. * * * On this point it has been definitely settled that where the taking is by or for the benefit of the State,

or one of its municipal corporations, it is not essential that payment should first be made before taking by condemnation, if an adequate and certain remedy for payment is provided against the State or municipality."

The same principles are set forth in *Remington Realty Co.* v. *City of Providence,* 89 R. I. 102, 106, where the court said:

"However, it is equally true that the legislature must in some manner make such payment certain and definite and unequivocally provide a remedy for enforcement. It must also appear from the statute that funds are set aside, that payment therefrom is obligatory, and that a procedure is available to the property owners for obtaining such payment."

In *Remington Realty Co., supra,* the court struck down the statute because, even though it assumed without deciding that the statute there provided an adequate remedy for enforcing the compensation claim, it found that the statute provided "no obligation, express or implied, to provide compensation from funds specifically made available for this purpose."

Our inquiry here is addressed to the question whether chap. 174 meets the tests set forth in those cases. As we have already indicated, it is our judgment that it does.

Chapter 169, sec. 3, directs the general treasurer to deposit the proceeds from the sale of bonds in the "recreation and conservation land acquisition and development fund of 1964" to be used for the purposes set forth in chap. 174. This clearly provides the funds required for the acquisition of property under the provisions of chap. 174.

The next question is whether chap. 174 provides an adequate and definite remedy for enforcing the claim. We think that it does. Section 32-4-6 as enacted by chap. 174 provides as follows:

"*Acquisition of lands.*—Lands acquired under this chapter by the state shall be acquired by the director with the approval of the governor by purchase, gift,

devise, or otherwise on such terms and conditions as the director shall determine, or by the exercise of eminent domain, in accordance with the provisions of chapter 37-6 of the general laws, as amended, insofar as the same are consistent with the provisions hereof. This power of acquisition shall extend to lands held by any local unit."

Thus chap. 174 incorporates by reference the eminent domain procedures prescribed in G. L. 1956, chap. 6 of title 37, as amended. Section 37-6-17 directs payment to the property owner where the price is agreed upon. Section 37-6-18 provides for the filing of a petition for assessment of damages by a jury. Section 37-6-23 provides a remedy for the enforcement by execution of any final judgment which may be recovered. In addition to the special fund created by chaps. 169 and 174, §37-6-14 provides:

"* * * all funds at any time in the state treasury not otherwise appropriated shall thereupon be available for the payment of the value of the land or other real property so taken and of appurtenant damage to any remainder with lawful interest thereon."

The procedure set forth in chap. 6 of title 37 for the acquisition of land by eminent domain is an adequate and definite remedy for enforcing a property owner's claim and meets the standard set in *Joslin, City of Newport* and *Remington Realty Co.,* all *supra.*

There is no merit in plaintiffs' argument that the faith and credit of the state are not pledged because the possibility exists that the proceeds from the sale of bonds together with any funds "not otherwise appropriated" may not be sufficient to pay them for the value of their property. This argument is merely speculative and conjectural and requires no further consideration. We agree with the observation of the trial justice that such an argument "would make practically all eminent domain statutes invalid."

Nor is there any merit in plaintiffs' contention that chap. 6 of title 37 provides for the power of eminent domain for

highway purposes only. The only section in chap. 6 of title 37 dealing specifically with highways is §37-6-13. All the other sections therein are general and contain no language indicating that the statute is limited to highway taking. In any event, inasmuch as chap. 174 provides that the powers of eminent domain provided therein are to be exercised in accordance with title 37, chap. 6, "insofar as the same are consistent with the provisions hereof," the procedures for taking and for making payments set forth in chap. 6 of title 37 are clearly incorporated by reference.

*Grimshaw* v. *City of Fall River*, 160 Mass. 483, does not support plaintiffs' contention on this issue. That case, as we understand it, holds that where a special eminent domain statute sets forth a remedy, the property owner is not limited solely to the remedy provided in the special statute, but may avail himself also of the provisions in the general statute.

We note, in concluding our discussion of point II, that we have considered all of plaintiffs' contentions under this portion of their brief, even though not expressly referred to herein.

Under point III plaintiffs contend that chaps. 169 and 174 are invalid because they delegate unlimited and unrestricted legislative powers to the director of administration in violation of secs. 2 and 10 of art. IV, of our state constitution, which vest legislative power exclusively in the general assembly. They allege in paragraph 6 of their complaint that by vesting in him the power to obligate the state of Rhode Island by accepting federal aid in the form of loans, without limitation or restriction as to the nature and amount thereof, chaps. 169 and 174 are in violation of art. IV, secs. 2 and 10. It is clear that plaintiffs are referring to sec. 10 of chap. 169 and §32-4-4. Since, as we have already stated, §32-4-4 vests the director with no more authority than he already has by virtue of sec. 10 of chap. 169, we do not deem it necessary to consider plain-

tiffs' contention with respect to §32-4-4. We shall therefore consider only sec. 10 of chap. 169, which provides in pertinent part as follows:

> "Federal assistance.—In carrying out this act, the director of administration is authorized to cooperate with and assist the federal government in all matters in furtherance of the purposes of this act, and on behalf of the state, with the approval of the governor, to apply for and accept any federal funds or federal assistance which may become available therefor, whether in the form of loans * * *."

In our judgment sec. 10 of chap. 169 does not violate art. IV, secs. 2 and 10. The power vested in the director by sec. 10 of chap. 169 is limited and well-defined. He cannot thereunder negotiate loans from the federal government for any purpose not connected with "carrying out this act" and not "in furtherance of the purposes of this act * * *." The general assembly authorized the director, with the approval of the governor, to administer chap. 169 within its well-defined purposes and limitations and the authority to borrow from the federal government is limited accordingly. The powers vested in the director are similar to those held to be properly delegable in *Pascale* v. *Capaldi*, 95 R. I. 38, where at page 41 the court said:

> "The statute authorizes the taking of land only for the specific purposes therein prescribed, thus establishing a legislative policy and standards to guide the director in exercising the authority vested in him by the provisions of §37-6-13. The statute empowers the director to determine the facts to which the policy as declared by the legislature is to apply. See *Panama Refining Co.* v. *Ryan*, 293 U. S. 388. This is not 'delegation running riot.' It is the most practical manner in which the legislative power to condemn may be exercised. *City of Newport* v. *Newport Water Corp.*, *supra*."

We have read *Opinion to the Governor*, 91 R. I. 346, and *Ennis* v. *State Highway Commission*, 231 Ind. 311, which

have been cited by plaintiffs, but fail to see how those cases help them here.

In our judgment the plaintiffs have not sustained their burden of proving beyond a reasonable doubt that chap. 169 is unconstitutional, and therefore have failed to state a claim against the defendants on which relief may be granted. We hold, accordingly, that the trial justice did not err in denying the plaintiffs' prayer for a permanent injunction and in granting the defendants' motion to dismiss.

The plaintiffs' appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the superior court for further proceedings.

*Moore, Virgadamo, Boyle & Lynch, Salvatore L. Virgadamo,* for plaintiffs.

*J. Joseph Nugent,* Attorney General, *Paul J. Choquette, Jr.,* Executive Counsel, *F. Monroe Allen,* Attorney for Frederick C. Lees, Director of Natural Resources, for defendants.