DECISION
This matter is before the Court on plaintiff's appeal of the final decision by the Rhode Island Building Contractors' Registration Board (hereinafter "Board") awarding damages to Mr. and Mrs. Robert Flynn after finding that the plaintiff had performed negligent and improper work. The plaintiffs, Stephen and Arlene Gould, have filed this appeal asking the Court to reverse the decision of the Board, to declare the Board's enabling statute, G.L. 1956 (1987 Reenactment) § 5-65-1 et seq. (1994 cum. supp.), unconstitutional, and to enjoin the Board from holding further hearings. Jurisdiction is pursuant to G.L. 1956 (1988 Reenactment) § 42-35-15.
Facts/Travel
On May 6, 1991, Robert and Jan Flynn filed a claim against Stephen and Arlene Gould with the Rhode Island Building Contractors' Registration Board (hereinafter "the Board"). The Flynns alleged that Mr. Gould performed negligent and improper work, and that Mr. Gould did not respond to requests to remedy the deficiencies in the Flynn's home. Hearings were held on the claim on June 13, July 12, and July 16, 1991 before Hearing Officer Thomas A. Lepre.[1] On July 26, 1991, Hearing Officer Lepre rendered the following proposed order:
 1) This matter does fall within the jurisdiction of the Building Contractors' Registration Board. R.I.G.L. Title 5-65-11, Div. 4, 4.4 (8) (b).
 2) The claimant is to receive a monetary payment from the respondent in the amount of $6,830.41. R.I.G.L. Title 5-65-12 and BCRB-1-90 Divisions 4 
6.
 3) Payment is to be made within 30 days.
 4) If payment is not made as directed the respondents registration is to be revoked and his certificate and registration card is to be returned to the Board immediately.
(Proposed Order at 3). After hearing testimony and viewing the
Flynns' house, the Board made the following findings of fact:
 1) Foundation cracks were evident in the basement adjacent to the rear cellar window.
 2) There was evidence of nail popping in the kitchen floor.
 3) Water leaked into the basement in the area of the fireplace.
 4) Weatherstripping around the garage door was loose.
 5) The formica countertop in the kitchen was improperly installed.
 6) The oak fireplace mantle in the family room had developed an unacceptable shrinkage crack.
 7) There were numerous areas of nail popping and poor workmanship in the drywall application throughout the house.
 8) The finish trim at a few windows showed areas where nails were not set properly, or not puttied; also doors were not adjusted properly.
 9) An abnormal gap was evident between the walls and the ceiling in all rooms on the second floor.
 10) There was evidence of a plumbing leak in the basement.
 11) The oak floor in the living room and the dining room showed evidence of splintering in a few areas.
(Proposed Order at 2). The Board unanimously affirmed the proposed order of the hearing officer on October 24, 1991, after hearing argument on October 10, 1991.
The Hearing Officer heard testimony from several individuals. Robert Flynn was the first to testify. He stated that he and his wife viewed the house built by Mr. Gould several times. The house was built on speculation, but was not finished on the inside. On the morning of the closing, Flynn made his final inspection and noticed several defects: scratches on woodwork, discoloring door hardware, problems with the atrium doors, and drywall and sheetrock problems. Flynn went through with the closing on October 30, 1990, but he withheld $1,000.00 of the $198,000.00 purchase price in escrow pending the repair of certain enumerated defects. Flynn testified that Gould did repair some of the defects but that some recurred later. Nevertheless, the $1,000.00 was subsequently released to Gould. On cross-examination, Flynn testified that he did not understand that the property was sold "as is" as stated in the purchase and sale agreement. Flynn testified that he had read the agreement and understood it as a layperson would understand it.
The next witness was the Flynn's expert, Robert Smith, the vice-president of C L Builders. He testified that he does several house inspections every year and that he inspected the Flynns' home on June 5, 1991. In conducting the inspection, Smith followed the Flynns' complaint list and Mrs. Flynn pointed out certain flaws in each room. Smith then made repair estimates, item by item, adding figures for labor costs and profit. Smith's total estimate was $17,273.03.
On cross-examination, Smith stated that he was familiar with the state building code and the truss method of roof construction, used in the Flynns' home. When making the inspection, Smith did not refer to plans or building permits, and he was not aware of the age of the structure or how long the Flynns had been living there. When asked what he considered improper workmanship, Smith said that generally the term encompasses a violation of the state building code or an unsafe condition, something unacceptable to the Building Trade.
Counsel for the Goulds then proceeded to question Smith on each specific problem, his opinion of the cause and his suggested method of correction. Smith stated that the separation of the walls and the ceiling could be caused by wood shrinkage or because the nail and screw holes were improperly finished. The possibility of truss uplift was mentioned, but Smith testified that he was not an engineer and had no comment on that issue. Smith observed that the shrinkage, although a common problem, was excessive in this house. Later in the cross-examination, Smith stated that he did not know when the separation occurred and that it could have resulted from one or more of the possible causes.
Smith observed small cracks in the flooring but stated that there was no indication of settlement. He was not prepared to say, however, that the cracks were caused by improper workmanship.
Smith observed that the radiator/plumbing caps were too short in that they did not come flush with the baseboard. The baseboards were adjusted to be flush with the caps. Smith testified that, in his opinion, this was not a proper method of correcting the situation even though it did not violate the building code and was not unsafe. Smith agreed that this condition was visible to the naked eye and to anyone buying the house. In addition, the baseboards were too short in Smith's opinion, but this was basically a cosmetic problem.
Nails were loosening in the linoleum and showed in the inlaid. Smith articulated two possible causes: 1) using an improper nail, and 2) not nailing the nails into the floor joist. Smith could not positively state that either of those problems occurred in this case. He suggested repairing the problem by taking up the linoleum and replacing the nails.
Smith observed scratches in the oak floor, but he did not observe gouges, stains or splinters. He did see two bruises in the floor, each approximately two feet long and one to two inches wide. Smith had no opinion of the cause of these bruises and was not prepared to say that they were the result of improper workmanship.
In the master bedroom, Smith stated that the closet door needed to be rehung. Upon further questioning, Smith testified that the current installation was not improper, did not violate the building code and was not unsafe. Smith also felt the doors in the laundry room needed to be rehung because the screws went directly into the dry wall. Although Smith did not know if the doors were unsafe in their present condition, he did state that the doors were functional and were not a violation of the building code. This condition was also visible to the naked eye.
In the garage, the weatherstripping was pulling away from its placement. Smith believed this was the result of placing the weatherstripping too tightly against the door. In order to remedy the situation, the weatherstripping would have to be reinstalled.
In the kitchen, Smith observed that the formica countertop was improperly installed. The gaps that existed were readily visible to the naked eye. Mrs. Flynn informed Smith that the smoke detector kept going off for no reason. Smith testified that this could be due to either improper placement, improper wiring, or a problem with the smoke detector itself.
Smith did not recall any gauges in the atrium doors. The hardware on the doors, however, was tarnished. The hardware was standard hardware supplied by Atrium and the tarnish was not due to improper installation. Smith stated the hardware was functional but had to be replaced as it was not repairable.
Smith testified that the oak mantle was defective. He also opined that the builder would know immediately that it was defective when it was purchased. This condition would have been visible from the day it was installed.
Mrs. Flynn informed Smith that there was puddling in the back yard that remained for 48 hours after a rain. Smith stated that the back lots should be regraded, but he could not say whether the problem was caused by improper grading or by settlement.
Mrs. Flynn informed Smith of a problem with the sliding screen. Smith testified that the screen needed to be rehung which could take 1-2 hours.
The claimant then rested.
The respondent first offered the testimony of Arthur Arnold. Arnold is an engineer who owns three retail lumber companies which sell materials to Gould and other builders. Arnold's testimony concerned the problem of separation of the walls and the ceiling. Arnold testified that he has seen this problem in hundreds of homes. According to him, the separation was caused by a combination of shrinkage and truss uplift. Arnold testified that green lumber[2], used in the Flynn's home, shrinks approximately 1/4" in a 2" x 10" board. There is no standard method of prevention unless the builder uses a pre-engineered product, which is often cost-prohibitive. Arnold did admit that it is possible to account for future shrinkage when building. Arnold also admitted that the gap in this house was larger than normal, but he attributes this to the fact that two normal problems, shrinkage and truss uplift, occurred at the same location. Arnold offered two solutions to the problem. First, the builder could retape and repaint the walls. This is most successfully done after the wood has dried for two years. Second, molding could be applied around the whole house near the ceiling. Arnold estimated that this repair would cost approximately $1200 — 1500.
Stephen Gould then testified on his own behalf. He stated that he has been a general contractor for 25 years and is registered with the Board. During his career, he has built approximately 100 homes. He is familiar with the Rhode Island Building Code and also does renovations, additions, and remodeling. The foundation for the Flynns' home was poured in November of 1989, and he began construction in March or April of 1990. Gould testified that there were no other agreements with the Flynns other than the purchase and sale agreement and some choices that needed to be made. Gould stated that he complied with the conditions requested by the Flynns and that he attempted to comply with further requests by the Flynns until he was told that he was not allowed to enter the house. In Gould's opinion, the separation of the walls and the ceiling was caused by shrinkage and truss uplift.
On cross-examination, Gould delineated the problems for which he felt he was responsible:
1) cracks in the foundation 2) popping of nails in the kitchen floor 3) leakage in area around fireplace 4) weatherstripping around garage doors 5) formica counter in kitchen 6) mantle in the family room 7) trim in windows 8) drip in pipe.
In Gould's estimation, these repairs would cost $3,500.00. This price did not include labor charges except for his work because his subcontractors do not charge for labor costs. Gould did admit that he did not consult the performance standards in making his estimate. When questioned about the door that did not have a door jamb, Gould stated that many houses in the same price range have the same type of doors.
The respondent's next witness was Arlene Gould who testified that there were no other agreements oral or written, with the Flynns. Mrs. Gould also testified that she heard the message from Mr. Flynn prohibiting Gould from entering his house.
The Goulds' final witness was expert witness, Charles Thomas. Thomas testified that he is a registered building contractor in the business since 1970. He primarily builds custom residential structures, but has engaged in some small commercial construction.
In Thomas' opinion, the separation of the walls and the ceiling was caused by shrinkage and truss uplift. Thomas would repair by applying a molding to cover the defect which would cost approximately $750.00 in labor and materials.
The plumbing/radiator caps were not deficiently installed according to Thomas. They could be pulled out flush with the baseboards at an approximate cost of $25.00.
Thomas offered three solutions for the nail popping in the linoleum. First, the contractor could place a metal block on the area and tap the nails down. Second, if the nails are accessible from the basement, they can be pulled down with vise grips. Third, the linoleum could be lifted and the nails removed. This option would cost approximately $50.00 and the others would cost less.
Thomas testified that he observed evidence of leakage in the basement near the fireplace. He believed that this problem was caused by ground settlement, and that it could be corrected by filling in with loam so that the ground slopes away from the building. This would cost approximately $100.00.
In order to repair the weatherstripping, Thomas would reinsert the piece of vinyl and move the weatherstripping back 1/8". This process would take approximately one hour and cost $25.00.
Thomas inspected the smoke detector that went off for apparently no reason. He questioned the location, but recognized that in South Kingstown, a builder will not receive a certificate of occupancy unless the detectors are placed where the building inspector says.
After examining the formica countertop in the kitchen, Thomas offered the opinion that there was an installation problem. He would repair by removing the sink and having the manufacturer rework the part that didn't hang right.
The respondent then rested.
Standard of Review
The review of a decision of the Commission by this Court is controlled by R.I.G.L. § 42-35-15(g) which provides for review of a contested agency decision:
 (g) The court shall not substitutes its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, or decisions are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Commission's decision. Newport Shipyard v. RhodeIsland Commission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897 (quoting Caswell v.George Sherman Sand and Gravel Co., 120 R.I. 1981, 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v.Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). On review of the Superior Court's judgment, the Supreme Court determines whether legally competent evidence exists to support the decision of the Superior Court. Rhode Island PublicTelecommunications Authority, et al. v. Rhode Island LaborRelations Board, et al., December 2, 1994, No. 93-268-M.P. at 20. The Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal ResourcesManagement Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflicts ofInterests Commission, 509 A.2d at 458.
Constitutional Arguments
Before reviewing the Board's decision itself, the court will first address the constitutional arguments presented by the plaintiff. The responding parties in this appeal have asked the court not to consider the Goulds' constitutional arguments as they were raised for the first time in this court. It is well-settled, however, that this court will consider a constitutional argument even if it was not raised at the administrative level. Randall v. Norberg, 121 R.I. 714, 721,403 A.2d 240, 244 (1979).
It is also well-settled that the determination of whether a statute is constitutional is a question of law for the court to decide. Power v. City of Providence, 582 A.2d 895, 902 (R.I. 1990). In examining a statute, it is necessary for the court to look at the entire statute as a whole to ascertain the legislature's intent rather than looking at each section as a separate entity. Donahue v. Rhode Island Department of MentalHealth, 632 F. Supp. 1456, 1476 (D.R.I. 1986) (quotingPhilbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975)). The statute is also entitled to a presumption of constitutionality. Donahue, 632, F. Supp. at 1476. The party challenging the constitutionality of the classification must prove it beyond a reasonable doubt. Power v.City of Providence, 582 A.2d 895, 904 (R.I. 1990) (citing Statev. Beck, 114 R.I. 74, 77, 329 A.2d 190, 193 (1974)).
I. Equal Protection
Plaintiff argues that G.L. 1956 (1987 Reenactment) § 5-65-1
et seq. (1994 cum. supp.) is violative of the Equal Protection clause of the United States Constitution, in that the statute only applies to builders of residential structures registered with the Board. Unregistered builders against whom claims are levied would be able to have their claim tried before a jury. In this way, a registered builder is punished for complying with the statute. The Goulds also claim that they were denied discovery; the ability to file a cross-claim or third party claim; the opportunity to file a counterclaim; the opportunity to file answers or assert affirmative defenses; and a legally educated hearing officer.
Before the court can decide whether the Board's enabling statute violates the equal protection clause, it is necessary to decide what level of scrutiny will be applied. When the statute concerns economic or social regulations, minimal scrutiny is generally applied. Boucher v. Sayeed, 459 A.2d 87, 91 (R.I. 1983). Both sides of this dispute have requested that the court apply minimal scrutiny or the rational basis test.
The rational basis test merely requires that the classification bear some relationship to a legitimate state interest. Boucher, 459 A.2d at 91. Even if the Legislature had an improper motive in passing the law, it will still satisfy the rational basis test is the court can find any legitimate objective. Power, 582 A.2d at 903.
Applying the rational basis test to the Board's enabling statute, the court finds that the Legislature intended the statute as a consumer protection statute. The Board serves as a regulator of builders of residential homes in the state. It provides a central place for homeowners to inquire if a particular builder is registered and to present any complaints they may have. It is reasonable for the legislature to assume that owners of commercial dwellings would know how to check the credentials of a particular builder. When the statute is viewed as one for consumer protection, the classification serves a legitimate state objective and satisfies the rational basis test.
The statute also exempts subcontractors and other professionals registered with another state commission. This is also a reasonable classification in that the statute in question provides a mechanism to regulate those individuals who were previously unregulated. Those registered with another state agency are presumably regulated by that agency, and consumers can seek information and register complaints with those agencies. The court is satisfied that there is a rational basis for this statute.
II. Right to a Jury Trial
The plaintiff's next argument is that the Board's enabling statute is violative of the Rhode Island Constitution in that it allows the Board to adjudicate the rights of private parties and to award damages without access to a jury trial. Article 1, § 15 of the Rhode Island Constitution provides that "[t]he right of trial by jury shall remain inviolate." Bendick v. Cambio,558 A.2d 941, 943 (R.I. 1989) (quoting Briggs Drive, Inc. v.Moorehead, 103 R.I. 555, 557, 239 A.2d 186, 187 (1968);Mathewson v. Ham, 21 R.I. 311, 43 A. 848 (1899)). It is well-settled in Rhode Island that this right applies to all cases that were triable by jury in 1842, the time when the Rhode Island Constitution was adopted. Bendick, 558 A.2d at 944; State v.Vinagro, 433 A.2d 945, 946-947 (R.I. 1981).
There are several Rhode Island cases dealing with the right to a jury trial in administrative proceedings. The Rhode Island Supreme Court has found that the right to a jury trial would attach where civil fines were imposed by an administrative agency that lacked the authority to do so. Bendick v. Cambio,558 A.2d 941, 945 (R.I. 1989). The fact that the enforcement action had to be brought in Superior Court rather than in an administrative setting was important in the Court's decision that the jury would not only have to determine liability, but also the amount of the fines. In another case where the administrative agency lacked authority to impose fines, the Court held that the jury would have the right to increase, decrease, or vacate any fine imposed by the Commission for violation of its regulations. F. RonciCompany, Inc. v. Narragansett Bay Water Quality ManagementDistrict Commission, 561 A.2d 874, 879 (R.I. 1989).
Most recently, in National Velour Corp. v. Durfee,637 A.2d 375 (R.I. 1994), the Court addressed a party's right to a jury trial where the agency is given discretion in imposing a fine. Instead of simply plugging numbers into a formula, See CaloreFreight Systems, Inc. v. State of Rhode Island Department ofTransportation, 576 A.2d 1214 (R.I. 1990), in this case the Department of Environmental Management (DEM) was authorized by statute to apply various factors to determine the existence, nature, and amount of the penalty. Id. at 378. The Court held that the Legislature did have the power to impose this administrative enforcement and regulatory scheme without providing the party charged with an opportunity to present its case to a jury. Id. In reaching this conclusion, the Court adopted the public rights doctrine developed by the United States Supreme Court. Id. at 379.
Public rights are those where the government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact. Id. (citing AtlasRoofing Co. v. Occupational Safety and Health Review Commission,430 U.S. 442, 450, 97 S.Ct. 1261, 1266, 51 L.Ed 2d 464, 472 (1977)). In these types of cases, the Court held that it was not necessary to provide a trial by jury. Id. "Public rights cases" are "[t]hose cases in which Congress may decline to provide jury trials are ones involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency or specialized court of equity. [W]e now refer to those rights as `public' rather than `private'." Id. at 379 (quoting Granfinanciera,S.A. v. Nordberg, 492 U.S. 33, 55 n. 10, 109 S.Ct. 2782, 2797 n. 10, 106 L.Ed 2d 26, 49 n. 10 (1989)).
In the present case, the Board made a finding of negligent and improper work for violations of its regulations, and imposed a damage award. Mr. Gould was ordered to pay the Flynns $6,830.41. If Mr. Gould did not make this payment within 30 days, the Board ordered that his license be revoked and that his certificate and registration card be returned to the Board immediately.
An action sounding in negligence where damages were sought from the opposing party is one that would have been triable to a jury in 1842, when the Rhode Island Constitution was adopted. In addition, the court finds that the ability to award damages to a claimant is not an integral part of the regulatory scheme of this statute. If the Board finds that a builder has violated its regulations, under its enabling statute, it may then make a finding of negligent work and then discipline the builder. Clearly, the Board in this case determined the rights of two private parties. In this case, the Board was not enforcing a statutorily created public right, but was adjudicating the negligence of one private party against another private party and assessing the amount of damages necessary to compensate the claimant. As the Board was determining the rights of private parties, the Goulds had the right to have the negligence and damages issues heard by a jury.
The court also notes that the Rhode Island cases regarding administrative fines and penalties all deal with the ability of an administrative agency to impose fines or penalties for violations of regulations. See National Velour, 637 A.2d at 381 ("[T]he right to jury trial is not included in the factfinding or penalty assessment entrusted to administrative agencies"). In these cases, the Court often based its decision, at least in part, on the fact that there would be little for the factfinder to do in imposing administrative fines. Such fines imposed were paid directly to the agencies involved.
It is undisputed in the present case that the Board did not have the authority to impose fines for regulation violations at the time this hearing was held. The subsequent amendment of the statute to allow the imposition of fines is persuasive that the Board lacked the authority to impose the fines when the hearing was held. F. Ronci Co. v. Narragansett Bay Water Commission,561 A.2d 874, 876 (R.I. 1989). Instead, the Board decided Mr. Gould was negligent in his work, and ordered him to pay damages to the Flynns. Assessing damages is a task which requires extensive factfinding on the part of the jury. It is not a proper subject for an administrative hearing. The court finds, therefore, that G.L. 1956 (1987 Reenactment) § 5-65-12(4) (1994 cum. supp.), which allows the Board to award damages to the claimant, violates Article 1, § 15 of the Rhode Island Constitution.
It is well-settled that whenever reasonably possible, the court must construe a duly enacted statute to be constitutional.Greenwich Bay Yacht Basin Associates v. Washburn, 560 A.2d 945, 948 (R.I. 1989); Landrigan v. McElroy, 457 A.2d 1056, 1061 (R.I. 1983). A court, however, may declare a portion of a statute unconstitutional and uphold the rest of the statute if the court finds that the unconstitutional portion is not indispensable to the rest of the statute, and can be severed without destroying the intent and purpose of the legislature. Greenwich Bay YachtBasin, 560 A.2d at 948; Landrigan, 457 A.2d at 1061 (citingBaffoni v. Rhode Island Department of Health, 118 R.I. 226, 235-236, 373 A.2d 184, 189 (1977); Chartier Real Estate Co. v.Chafee, 101 R.I. 544, 556, 225 A.2d 766, 773 (1967)). The test for determining the separability of a section of a statute is whether, at the time the statute was passed, the legislature would have enacted it without the unconstitutional portion.Landrigan, 457 A.2d at 1061 (citing Scheinberg v. Smith,659 F.2d 476, 481 (5th Cir. 1981)). This is true even in the absence of a severability clause because inherent in the judiciary is the power to hold portions of a statute unconstitutional while sustaining other portions. Landrigan, 457 A.2d at 1061 (citing 2 Sutherland § 44.08 at 350).
In the instant matter, although the Board's enabling statute does not contain a severability provision, the court finds that the legislature would have enacted the statute without the section that allows the Board to award damages to a claimant. Even without this provision, the statute provides the Board with the authority to regulate registered builders through disciplinary proceedings for violations of its regulations. Accordingly, the power to award damages is unnecessary as the claimant is still free to pursue an action in the courts where he or she may receive compensatory damages.
The court finds that G.L. 1956 (1987 Reenactment) §5-65-12(4) (1994 cum. supp.) of the Board's enabling statute that allows it to assess damages for negligent and improper work violates Article I § 15 of the Rhode Island Constitution. Even though the Board's enabling statute contains no severability clause, as the court finds this section is not indispensable to achieving the intent of the legislature, only this section will be stricken as unconstitutional. As the court finds that the Board cannot award damages to a claimant, it is unnecessary to address the remainder of the plaintiffs' arguments concerning the actual decision of the Board.
After review of the record, the court finds that the decision of the Board is in violation of Article 1, § 15 of the Rhode Island Constitution and that substantial rights of the appellant have been prejudiced. Accordingly, the decision of the Board is reversed and the damage award is vacated.
[1] Also present at the hearings were John R. Picerne, Executive Secretary of the Board, and Robert Hunt, Board Investigator.
[2] Green lumber is any piece of lumber with a moisture content over 19%. According to Arnold's testimony, green lumber is used in approximately 95% of Rhode Island homes.