OPINION TO THE GOVERNOR.

JANUARY 23, 1964.

202

To His Excellency John H. Chafee
        Governor of the State of Rhode Island
            and Providence Plantations

We have received from Your Excellency, as authorized by section 2 of article XII of amendments to the constitution of the state, a request for our written opinion upon the following questions:

"1. Do the provisions of Section 24-12-40, as amended, to the effect that following the vesting of title to the Jamestown Bridge in the State of Rhode Island, the State shall maintain, repair and operate the Jamestown Bridge as a portion of the State Highway System, violate Section 1 of Article XXXI of the Amendments to the Constitution of Rhode Island as incurring a debt of the State in excess of fifty thousand dollars without the express consent of the people?

"2. Do the provisions of said Section 24-12-40, as amended, to the effect that during the period when the bonds or obligations of the Authority issued to pay the cost of the Newport Bridge shall be outstanding and unpaid, the State covenants and agrees with the bondholders that the laws of Rhode Island shall not be amended to authorize or permit the charging and collecting of tolls on the Jamestown Bridge, constitute an illegal attempt to prevent the exercise of legislative discretion by succeeding General Assemblies in violation of Section 2 of Article IV of the Constitution of Rhode Island?

"3. Do the provisions of Section 24-12-43, as amended, which require the payment by the State of all expenses of maintaining, repairing and operating the Newport Bridge until all bonds, including the interest thereon, issued under the provisions of the Enabling Act shall have been paid, violate Section 1 of Article XXXI of Amendments to the Constitution of Rhode Island as incurring a debt of the State in excess of fifty

thousand dollars or as pledging the faith of the State for the payment of the obligations of others, without the express consent of the people?

"4. Do the provisions of Sections 24-12-44A and 24-12-44B, as added by Public Laws, 1963, Chapter 165, which authorize the Authority and the Department of Public Works to enter into an agreement and lease whereby the Department will pay the cost of maintaining, repairing and operating the Newport Bridge and the Mount Hope Bridge until the final maturity of the bonds issued to pay the cost of said bridges, violate Section 1 of Article XXXI of Amendments to the Constitution of Rhode Island as incurring a debt of the State in excess of fifty thousand dollars or as pledging the faith of the State for the payment of the obligations of others, without the express consent of the people?

"5. Do the provisions of said Sections 24-12-44A and 24-12-44B, which authorize the Department of Public Works to lease the Newport Bridge and the Mount Hope Bridge from the Authority and to pay stipulated rentals as a general obligation of the Department payable not only from the revenues of said bridges but also from any other available funds of the Department in the annual period in which the lease is entered into and in each annual period thereafter for which the lease at the sole option of the department may be renewed, violate Section 1 of Article XXXI of Amendments to the Constitution of Rhode Island as incurring a debt of the State in excess of fifty thousand dollars or as pledging the faith of the State for the payment of the obligations of others, without the express consent of the people?"

After a careful analysis of the several problems therein presented which arise from interpretations of the applicable sections as they may be related to the constitutional provisions referred to our attention, we are pleased to comply with Your Excellency's request.

The pertinent provisions of the relevant sections of G. L. 1956, chap. 12 of title 24, as amended, are so voluminous

that we have deemed it advisable not to protract this opinion nor separate the respective answers from the questions to which they relate by quoting them. Rather, we respectfully refer Your Excellency and interested parties to the cited sections as they appear in the general laws as amended.

The first two questions, although not directed to the same article of the constitution, are based on the provisions of §24-12-40 and for this reason are herein consolidated.

By virtue of the provisions of secs. 1, 6, 9 and 12 of P. L. 1937, chap. 2536, entitled "An Act Relating To The Construction Of A Toll Bridge Between The Towns Of Jamestown And North Kingstown: Providing For The Creation Of A Bridge Commission: Authorizing Said Commission To Construct, Operate And Maintain Said Bridge And Authorizing The Issuance Of Bridge Revenue Bonds Of The State," and sec. 14 thereof as amended by P. L. 1942, chap. 1158, the cost of operating and maintaining the Jamestown bridge presently imposes no financial burden on the state. The revenue required therefor, as well as that which must be raised to discharge its bonded indebtedness, is currently secured by the imposition of tolls. It is proposed, however, pursuant to G. L. 1956, §24-12-40, as amended, that the bridge shall be immediately acquired and thereafter operated and maintained by the state as a toll free adjunct to the state highway system, so long as revenue bonds to be issued by the Rhode Island turnpike and bridge authority, hereinafter called the turnpike authority, shall remain outstanding. Indeed, by the last sentence of that section the state so covenants and agrees.

Manifestly then, upon the issuance of such revenue bonds the state is purportedly contractually bound to the holders thereof to assume the annual cost of operating and maintaining the Jamestown bridge which, without the collection of tolls, would unquestionably result in incurring a debt in

excess of $50,000. If therefore the assumption of the obligation to operate and maintain the bridge as an expense of the state is to be regarded as binding, such obligation is in violation of art. XXXI, §1, of amendments to the state constitution which provides in pertinent part as follows:

> "The general assembly shall have no powers, hereafter, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars * * *; nor shall they in any case, without such consent, pledge the faith of the state for the payment of the obligations of others."

Furthermore, when pursuant to P. L. 1937, chap. 2536, as amended, the bridge becomes the property of the state, it will become the prerogative of the people, acting through the general assembly, to make such use of their property as seems desirable, it no longer being otherwise encumbered. Since, however, revenue bonds issued by the turnpike authority will be outstanding years after the bridge will have otherwise been acquired by the people, the obligation to operate and maintain it during such years is tantamount to pledging the faith of the state without prior consent in accordance with art. XXXI, §1, of amendments. See *Opinion to the Governor*, 94 R. I. 464, 181 A.2d 618.

Again, at such time when title to the bridge becomes vested in the state, it would ordinarily be within the discretion of the general assembly to operate and maintain it as a part of the state highway system with or without the imposition of tolls. It is proposed by §24-12-40, however, to withhold the exercise of such discretion, and that proposal clearly constitutes an unconstitutional interference with the legislative powers conferred by art. IV, §§2 and 10, of the state constitution since the authority therein vested is conferred anew on each succeeding elected assembly. See *Stone* v. *Mississippi*, 101 U. S. 814; *Texas & New Orleans R.R.* v. *Miller*, 221 U. S. 408.

The first two questions are therefore answered in the affirmative.

The third question arises from provisions contained in §24-12-43, as amended. It suffices here to observe that it is thereby proposed that the state shall bear the cost of operating and maintaining a bridge across the east passage from Jamestown to Newport, which bridge is to be constructed by the turnpike authority with proceeds from the sale of the revenue bonds to be issued by it. The section in question further provides that it will be the obligation of the state to thus operate and maintain the bridge so long as any of such revenue bonds remain outstanding.

This proposal is prefaced by language which suggests that since the state is already obligated to maintain ferry services between Jamestown and Newport at an annual cost of some $500,000, the obligation to operate and maintain the bridge, which would be substituted for the ferry services, constitutes at least in part nothing more than a substitution of one obligation for another in the maintenance of a highway system linking the communities of Jamestown and Newport.

Assuming that the cost of operating and maintaining the proposed bridge would be no greater than that which is required to provide the existing ferry, the question and the section to which it relates erroneously presuppose that the state is presently bound to maintain the ferry. However, it is within the constitutional prerogatives of the general assembly to abandon it as part of the state highway system, leaving it for private enterprise to provide such ferry services. *Hoboken* v. *Pennsylvania R.R.*, 124 U. S. 656; *Wales* v. *Stetson*, 2 Mass. 143.

It is no answer to say that the general assembly would never, in all likelihood, fail to provide a governmentally supported means of travel between the communities in question. It is elementary that the controlling factor is not whether the legislature will exercise its discretion in a

given manner, but rather whether the right of discretion exists.

The assumption of the obligation to operate and maintain the proposed bridge for so long a period as any of the revenue bonds may remain outstanding is a substitution of a debt for the present system of a year-to-year expense out of current revenues, terminable at the will of the general assembly. Moreover the Newport bridge, so called, is to be built by and title thereto vested in the Rhode Island turnpike and bridge authority, a body corporate, which may sue and be sued. Title to the bridge remains vested in the turnpike authority until the last of the revenue bonds, from the proceeds of which the bridge would be constructed, is discharged both as to principal and interest. Not until then would the bridge become the property of the state of Rhode Island. See *Opinion to the Governor,* 88 R. I. 202. The assumption of the obligation proposed by said §24-12-43 is therefore an incurring of a debt in excess of $50,000 and a pledging of the faith of the state for the obligations of others within the meaning of art. XXXI, §1, of amendments to the state constitution.

The third question is therefore answered in the affirmative.

It is also our opinion that the fourth question must be similarly answered as it relates to both prohibitions contained in art. XXXI, §1, of amendments to the state constitution. It is clear from a reading of G. L. 1956, chap. 12 of title 24, as amended, that in addition to the building of the Newport bridge, so called, the turnpike authority is to succeed in title to the Mount Hope bridge and to the prerogatives and functions of the Mount Hope bridge authority when that agency is dissolved upon the retirement of the present bonded indebtedness. See §24-12-40A.

Thereafter, and until revenue bonds issued by the turnpike authority are discharged, it will operate the Mount

Hope bridge as a toll bridge or at least until there shall have been established a fund for the payment of engineering, financing and legal services in connection with the financing and construction of the Newport bridge. Here, as in the case of the Jamestown bridge, property which would otherwise vest in the people of the state will be pledged to secure the obligation of the turnpike authority which, as has been previously observed, is an "other" within the meaning of art. XXXI, §1, of amendments.

Moreover, although we have no specific information as to the amount involved in the annual operating and maintenance costs of the Mount Hope bridge, there is little doubt but that the assumption by the state of such costs would be in excess of $50,000. Clearly then, the making of an agreement between the department of public works and the turnpike authority whereby the former would be obligated, so long as turnpike revenue bonds were outstanding, to operate and maintain the bridge from public funds would be in contravention of the aforesaid art. XXXI of amendments.

The fifth question is of similar import, save only that it inquires into the legality of a lease or leases to be entered into between the department of public works and the turnpike authority whereby the former, operating and maintaining the bridges in question, would be credited with the toll revenues and thus be responsible for a deficit only if the tolls should prove insufficient.

The question appears to be predicated on the proposition that such lease or leases would run from year to year at the exclusive option of the department of public works, so— or such seems to be the suggestion—that if a lease in any year should result in placing a burden on the state, it could terminate such burden or obligation by the simple means of failing to renew its option.

The short answer to this, however, is to be found in §24-12-44B(b) wherein it is provided:

"that as to the cost of maintaining, repairing and operating the project, and not otherwise, the department is contractually bound not only for the remainder of the annual period in which the lease is dated and executed, but for the entire period of years until the final maturity of such bonds * * *."

Thus, as to the cost of operating, repairing and maintaining the Mount Hope and Newport bridges the same objections prevail as those which governed our opinion as the same related to the prior questions herein propounded by Your Excellency.

In summation then, the Rhode Island turnpike and bridge authority, like the general assembly which created it, is subject to the prohibitions laid down by the people in art. XXXI, §1, of amendments to the state constitution. Therefore, without the express consent of the people the turnpike authority cannot make any valid commitments which will obligate the state to an indebtedness in excess of $50,-000. Nor, absent such consent, can it make a commitment which, purporting to pledge the faith of the state, will be binding on the people. Similarly, it cannot by an invalid commitment preclude the legislature from amending, modifying or repealing any or all provisions of law relating to the Rhode Island turnpike and bridge authority which may have been enacted by a previous session of the general assembly.

Mr. Justice Paolino did not participate in the consideration of these questions.

FRANCIS B. CONDON
THOMAS H. ROBERTS
WILLIAM E. POWERS
ALFRED H. JOSLIN