308 A.2d 809.

## Opinion to the Governor.

AUGUST 8, 1973.

PRESENT: Roberts, C. J., Paolino, Kelleher and Doris, JJ.

152

ADVISORY OPINION to Governor relative to public corporate entity designated as Rhode Island Public Housing and Mortgage Finance Corporation.

August 8, 1973

To His Excellency Philip W. Noel
   Governor of the State of Rhode Island
   and Providence Plantations

The undersigned, in fulfillment of their constitutional obligation to advise you on questions of law affecting legislation that has been enacted into law, forward this communication to you as a reply to the questions you posed about an Act passed by the General Assembly at its January, 1973 session. The Act now known as "73-H 6104, Substitute A," created a public corporate entity designated as the Rhode Island Housing and Mortgage Finance Corporation. Your inquiries manifest a concern as to (1) whether the Act serves a public purpose; (2) whether its funding provisions constitute an unconstitutional incurment of a debt or pledge of the state's credit; and (3)

whether there has been an unlawful delegation of the legislative power to the corporation.

In seeking to resolve the "public purpose" portion of our answer, we shall briefly summarize the legislation. The Act is replete with details as to the purposes of the new corporation, its organizational setup and its funding. In order to carry out its corporate purpose, the corporation is authorized to accept federal funds and other assistance, to issue revenue bonds or notes, and to purchase and sell first mortgages and notes. The entire thrust of the complex statutory provisions is to increase in a particular area of building construction the availability of mortgage money at favorable interest rates. The corporation's attractive interest rate will be achieved because the corporation will obtain borrowed money on a favorable basis through the issuance of tax free bonds or notes and pass the savings on to its borrower, who would be charged higher interest rates in the general mortgage market.

Section 2 contains a positive declaration that there exists within Rhode Island a shortage of safe, sanitary residential housing serving the needs of those whose family income falls within the low to moderate income bracket. There is also found in this section an observation that the health care facilities located within the state are inadequate to meet the demands of modern medical care. The General Assembly reports that these shortcomings cannot be cured by private enterprise, and that the solution lies in the creation of the Rhode Island Housing and Mortgage Finance Corporation, whose goal will be the stimulation of the construction and rehabilitation of residential housing and health care facilities through the use of public funds.

Health care facilities are defined as:

> " 'Health care facilities' means real property (or a lease of the fee of real property) located in the State and improved by buildings, structures or other improvements, including fixtures and equipment, consti-

tuting a facility providing services by or under the supervision of a physician or, in the case of a dental clinic or dental dispensary, of a dentist, for the prevention, diagnosis or treatment of a human disease, pain, injury, deformity or physical condition, or constituting a facility providing to occupants, nursing care to sick, invalid, infirm, disabled or convalescent persons, in addition to lodging and board or health-related service or providing nursing care and health-related service to persons who are not occupants of the facilities, or unimproved if the proceeds of an eligible mortgage shall be used for the purpose of erecting such buildings, structures or other improvements."

The Act sets forth criteria to be used in determining the persons or families whose income can be classified as "low" or "moderate."

When considering the issue of the public purpose of the Act, we think it appropriate that we repeat here what the court said in *Romeo v. Cranston Redevelopment Agency,* 105 R. I. 651, 254 A.2d 426 (1969), when it attempted to describe the requisite "public use" that permits acquisition of private property by eminent domain:

> "Today * * * it is our belief that a public use may not be given a rigid, unbending, absolute definition. In the everchanging conditions of our modern society, new advances in the fields of sciences, new concepts in the scope and function of government and other circumstances make it clear that the former concept as to what is a public use has undergone a great change. Views as to what constitutes a public use necessarily vary with the changing conceptions of the scope and functions of government so that today there are familiar examples of such use which years ago would be unheard of. As governmental activities and services increased with the growing demands of society, the concept of 'public use' has broadened in proportion thereto. The modern trend of authority is to expand and liberally construe the meaning of 'public use.' " *Id.* at 658, 254 A.2d at 431.

What was said about a "public use" can also be said of a "public purpose." There is no fixed static definition of "public purpose." It is a concept which expands with the march of time. It changes with the changing conditions of our society. What today is not a public purpose may to future generations yet unborn be unquestionably a public purpose. "Public purpose" is a flexible phrase which expands to meet the needs of a complex society even though the need was unheard of when our state constitution was adopted in 1842.

In determining the presence of public purpose, we are cognizant that while legislative findings in this area are subject to review, such a determination is entitled to great deference by the judiciary. *Berman* v. *Parker,* 348 U. S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *Romeo* v. *Cranston Redevelopment Agency, supra; Narragansett Electric Lighting Co.* v. *Sabre,* 50 R. I. 288, 146 A. 777 (1929). An act of the Legislature commands judicial approval if, on any reasonable view, the act is designed to protect the public health, safety and welfare. *State ex rel. Colvin* v. *Lombardi,* 104 R. I. 28, 241 A.2d 625 (1968). Furthermore, if the principal thrust and object of a given enactment is public in nature, its public purpose is not invalidated because there may be an incidental benefit to private interests. *People ex rel. City of Salem* v. *McMackin,* 53 Ill.2d 347, 291 N.E.2d 807 (1972); *Whelan* v. *New Jersey Power & Light Co.,* 45 N. J. 237, 212 A.2d 136 (1965); *Vermont Educational Buildings Financing Agency* v. *Mann,* 127 Vt. 262, 247 A.2d 68 (1968); *Clifford* v. *City of Cheyenne,* 487 P.2d 1325 (Wyo. 1971).

The participation of government with private enterprise in efforts to improve housing conditions has long been recognized as a proper use of the police power. The elimination of overcrowded, unsanitary and dangerous dwelling accommodations and the assisting in making available de-

cent, safe and sanitary housing for people whose income would make such an acquisition impossible unquestionably serves a public purpose. *Maine State Housing Authority v. Depositors Trust Co.,* Me., 278 A.2d 699 (1971); *Massachusetts Housing Finance Agency* v. *New England Merchants National Bank,* 356 Mass. 202, 249 N.E.2d 599 (1969); *In re Advisory Opinion,* 380 Mich. 554, 158 N.W.2d 416 (1968); *Vermont Home Mortgage Credit Agency* v. *Montpelier National Bank,* 128 Vt. 272, 262 A.2d 445 (1970).

So far as the financing of health facilities is concerned, we think it obvious that in the day of soaring medical costs, there is a public purpose to be served by the state's imaginative entry in this particular area. Nursing and convalescent homes play an extremely important role in the care and treatment of the chronically ill or those patients who need extended care. The presence of such facilities frees hospital beds to those who are in need of the highly sophisticated care and equipment that are usually found only in a hospital. Dental clinics or dispensaries insure a proper standard of oral hygiene which in turn safeguards the patient's good health. This portion of the legislation serves the public health and general welfare and constitutes a proper public purpose for which public funds may be used. *Greer* v. *Kentucky Health & Geriatric Authority,* 467 S.W.2d 340 (Ky. 1971).

The housing and health care facilities aspects of the 1973 legislation presently before us are indeed public purposes.

Your apprehension as to the funding provisions running afoul of the constitutional prohibitions against incurring debts of over $50,000 or pledging the state's credit for the debts of others without the specific permission of the voters obviously stems from Section 14(4) of the Act. In essence, this section requires the chairman of the corporation to

file annually a report to the Governor stating the sum, if any, which is needed to restore the minimum capital reserve fund balances called for in the Act. The report is due on or before December 1. The Governor is to include this sum in the annual budget he is to submit to the General Assembly the following year. The Act then specifically provides that all sums "* * * appropriated by the General Assembly, *if any*, and paid to the corporation shall be deposited by the corporation in the applicable capital reserve fund." (emphasis added)

Section 14(4) must be read in *pari materia* with Section 19. The latter section makes it clear that the corporate bonds and notes are not to be considered as an obligation of the state but are to be payable solely from the corporation's assets and revenues. A recitation to this effect is to be imprinted on each obligation issued by the corporation.

These two legislative statements make it clear to us that at no time did the 1973 General Assembly ever attempt to bind its successors to making an appropriation to the corporation's capital reserve fund at some unforeseeable future date. In 1964, the then Governor was advised that any statutory effort to limit a future General Assembly in the exercise of its discretion would constitute an unconstitutional interference with the legislative powers conferred by art. IV, secs. 2 and 10, since the authority vested therein is conferred anew on each succeeding elected assembly. *Opinion to the Governor,* 97 R. I. 200, 196 A.2d 829 (1964).

Even though the Governor's annual budgetary recommendations to the General Assembly will include the chairman's request, the Legislature still retains its right to concur or disagree with the Chief Executive's recommendations. Section 14(4) in no way constitutes an unconstitutional incurrence of a debt or a pledge of the state's credit. Similar conclusions on this identical issue have been reached in other jurisdictions. *Maine State Housing Authority* v.

158

*Depositors Trust Co.*, *supra*; *Massachusetts Housing Finance Agency* v. *New England Merchants National Bank*, *supra*; *In re Advisory Opinion, supra*; *Martin* v. *North Carolina Housing Corp.*, 277 N. C. 29, 175 S.E.2d 665 (1970).

Lastly, delegation of the Legislature's powers to administrative agencies is constitutionally permissible provided the powers are transferred in expressly defined channels. *City of Warwick* v. *Warwick Regular Firemen's Ass'n*, 106 R. I. 109, 256 A.2d 206 (1969); *First Federal Savings & Loan Ass'n* v. *Langton*, 105 R. I. 236, 251 A.2d 170 (1969).

The legislation now before us has adequate safeguards against arbitrary and capricious administration. The Act's purposes are explicitly stated. The corporation's powers and limitations are specifically delineated. The Act does not permit the corporation to act as a lawmaker. The corporate power is well vested in seven commissioners. The Act gives them the necessary "administrative discretion" so that they can work within the guidelines established by the General Assembly at the intricate and intriguing subject of secondary mortgage financing. *Blais* v. *Franklin*, 31 R. I. 95, 77 A. 172 (1910). For these reasons we cannot fault the delegation made by the Legislature.

THOMAS H. ROBERTS
THOMAS J. PAOLINO
THOMAS F. KELLEHER
JOHN F. DORIS

Mr. Justice Joslin did not participate in the consideration of the inquiries posed herein.

*Tillinghast, Collins & Graham, James J. Skeffington, Edwin K. Hall; James J. Jerue, Executive Counsel to the Governor*, for the Governor.