**WARWICK MALL TRUST et al.**

v.

**The STATE of Rhode Island et al.**

**No. 96–162–Appeal.**

Supreme Court of Rhode Island.

Oct. 11, 1996.

J. William Harsch, John Marks, Wakefield, for Plaintiff.

Jeffrey B. Pine, Attorney General, Lisa Dinerman, Special Assistant Attorney General, Joseph S. Larisa, Jr., Executive Counsel to Governor William P. Robinson & Mark A Pogue (Edwards & Angell) Brendan V. Sullivan, Jr., John G. Kester, Paul Mogin and Dan S. Sokolov (Williams & Connolly), for Defendant.

**OPINION**

FLANDERS, Justice.

This appeal has challenged the constitutionality of legislation enacted by the Rhode Island General Assembly in 1995[1] authorizing the Rhode Island Economic Development

---

1. Public Laws 1995, ch. 400 (the Enabling Act). This legislation passed with the assent of over two-thirds of the members elected to each house of the General Assembly. Journal of the House of Representatives, Vol. 122, No. 76 at H.J.–19 (67 yeas and 33 nays); Journal of the Senate, Vol. 122, No. 77 at S.J.–24 (36 yeas and 13 nays).

Corporation (the EDC) and the city of Providence to enter into a long-term tax-exemption agreement with the developer of the proposed Providence Place Project (the Project), a large retail-shopping mall and parking garage to be located in Providence.

The plaintiffs, Warwick Mall Trust and Bliss Properties, Inc., are the owner and the operator, respectively, of a shopping mall located in Warwick, Rhode Island. The plaintiff Irving Schwartz is a city of Providence voter and taxpayer. The defendants are the State of Rhode Island; Lincoln C. Almond, in his capacity as Rhode Island's Governor and as the chairman of the EDC; and the Providence Place Group Limited Partnership, a New York limited partnership that is the Project's developer.

The Superior Court entered a judgment dismissing plaintiffs' complaint for failing to state a claim upon which relief could be granted. Super. R. Civ. P. 12(b)(6). The plaintiffs then appealed from that adverse judgment, asserting the Enabling Act's unconstitutionality on the grounds that it violates the municipal voter-approval requirements of the home rule article,[2] constitutes an illegal pledge of the state's credit by the EDC,[3] and improperly delegates tax-exempting legislative authority to the EDC.[4]

On July 19, 1996, after reviewing the parties' legal briefs, hearing their oral arguments, and considering their respective legal positions, we issued a brief order affirming the Superior Court's judgment dismissing plaintiffs' complaint.[5] We now set forth the reasons for our decision.

## I

**Because the General Assembly Retains Its Exclusive Power to Authorize Municipal Taxation and Borrowing, the Home Rule Article Does Not Require Local Voter Approval of the Enabling Act.**

■ Despite the addition of the home rule article to Rhode Island's Constitution in 1951, cities and towns remain powerless "to levy, assess and collect taxes or to borrow money, except as authorized by the general assembly." R.I. Const., art. XIII, sec. 5.[6] The Enabling Act authorizes the city of Providence to enter into a long-term tax-treaty agreement with the developer of the Project. Pursuant to the proposed tax treaty, the developer's payments in lieu of taxes are earmarked for the Project's debt service and are amortized over a thirty-year period.

2. Article XIII, section 4, of the Rhode Island Constitution declares:

"The general assembly shall have the power to act in relation to the property, affairs and government of any city or town by general laws which shall apply alike to all cities and towns, but which shall not affect the form of government of any city or town. The general assembly shall also have the power to act in relation to the property, affairs and government of a particular city or town provided that such legislative action shall become effective only upon approval by a majority of the qualified electors of the said city or town voting at a general or special election, except that in the case of acts involving the imposition of a tax or the expenditure of money by a town the same shall provide for the submission thereof to those electors in said town qualified to vote upon a proposition to impose a tax or for the expenditure of money."

3. Article VI, section 16, of our constitution states:

"The general assembly shall have no powers, without the express consent of the people, to incur state debts to an amount exceeding fifty thousand dollars, except in time of war, or in

case of insurrection or invasion; nor shall it in any case, without such consent, pledge the faith of the state for the payment of the obligations of others. This section shall not be construed to refer to any money that may be deposited with the state by the government of the United States."

4. Article VI, section 1, provides that "[t]his Constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void. The general assembly shall pass all laws necessary to carry this Constitution into effect." Section 2 adds that "[t]he legislative power, under this Constitution, shall be vested in two houses, the one to be called the senate, the other, the house of representatives * * *."

5. We assumed without deciding that plaintiffs had standing to mount this constitutional attack on the Enabling Act.

6. Article XIII, section 5, states that "[n]othing contained in [article XIII] shall be deemed to grant to any city or town the power to levy, assess and collect taxes or to borrow money, except as authorized by the general assembly."

A municipality's power to negotiate for payments of this kind from property owners located within its jurisdiction and its power to abate such payments, to allocate them for certain purposes, or to exempt certain property in whole or in part from municipal taxation are all actions derivative of and subsumed by its basic authority *vel non* to levy, to assess, and to collect taxes. *See, e.g., Crafts v. Ray*, 22 R.I. 179, 183, 46 A. 1043, 1043 (1900) (noting that the "power to tax necessarily implies a power to exempt"). If a city or a town cannot levy, assess, and collect taxes without General Assembly authorization, then it certainly cannot abate, exempt, or allocate payments it would otherwise be entitled to receive as taxes (or to negotiate for their receipt as payments in lieu of taxes) without such authorization.[7]

If consummated, the proposed tax treaty contemplated by the Enabling Act would effectively exempt the Project's real and personal property from municipal taxation for over thirty years. It would do so by earmarking what would otherwise constitute payments in lieu of taxes for debt-service payments to the Project's lenders. In any event the city's ability "to levy, assess and collect taxes or to borrow money" with respect to the Project will be affected by this legislation for the foreseeable future. Accordingly we deem the Enabling Act to fall within the General Assembly's exclusive reserved power to authorize local taxation pursuant to article XIII, section 5, of the Rhode Island Constitution.

Despite the tax-enabling features of this legislation, plaintiffs still argued that because the Enabling Act remained an act "in relation to the property, affairs and government" of a particular home-rule city or town (namely, the city of Providence), it could "become effective only upon approval by a majority of the qualified electors of the said city or town voting at a general or special election * * *." R.I. Const., art. XIII, sec. 4. Although this appears at first blush to be a plausible reading of sec. 4 of the home rule article, that section cannot be read in isolation from sec. 5 of this same article. In construing sec. 5, this court has already opined that, notwithstanding a municipality's adoption of a home rule charter, the General Assembly still retains "*its exclusive power* to legislate by general or *special acts* in granting to a city or town authority 'to levy, assess and collect taxes or to borrow money * * *.' This power is expressly reserved to the General Assembly under section 5 of said article [presently section 5 of article XIII]." (Emphases added.) *Opinion to the House of Representatives*, 79 R.I. 277, 280, 87 A.2d 693, 696 (1952).

If, as plaintiffs have contended, local voters in a home-rule city or town like Providence still have the right to approve any specific tax-enabling legislation enacted by the General Assembly pertaining to their municipality, then the Legislature would be powerless to pass such laws without first obtaining local voter approval. However, this result would be inconsistent with the conclusion we reached in *Opinion to the House of Representatives* that the General Assembly retains the *exclusive* power to authorize local taxation by general or *special* acts. *Id.* Instead of the General Assembly's retaining an exclusive power to authorize municipal taxation in *any* particular city or town as provided for in sec. 5, its sec. 5-enabling power would be a shared, conditional, and nonexclusive one. Just as a municipality could pass no local tax legislation without General Assembly authorization, the General Assembly could pass no local tax-enabling laws without local voter approval. Such a prescription for local tax

---

7. We note, for example, that G.L.1956 § 44-3-9 provides in part:

"(a)(1) Except as hereinafter provided, the electors of any town qualified to vote on a proposition to appropriate money or impose a tax when legally assembled, may vote to authorize the town council of the town, for a period not exceeding ten (10) years, and subject to the conditions as hereinafter provided, to exempt from payment, in whole or in part, real and personal property used for manufacturing, or commercial purposes, or to determine a stabilized amount of taxes to be paid on account of the property, notwithstanding the valuation of the property or the rate of tax; * * *

" * * *

"(b) Cities shall have the same authority as is granted to towns except that authority granted to the qualified electors of a town and to town councils shall be exercised in the case of a city by the city council."

gridlock would be at odds with article XIII, section 5's refusal to grant cities and towns *any* power with respect to local taxation except as authorized by the General Assembly.

Moreover, if plaintiffs' constitutional interpretation were correct, then municipal voters in home-rule cities would be empowered to veto any local tax-enabling laws enacted by the General Assembly. Far from being powerless and dependent on General Assembly authorization to act on local tax issues, each city or town, through its municipal voters, could stymie the General Assembly's exercise of its exclusive power to pass "special acts in granting to a city or town authority 'to levy, assess and collect taxes or to borrow money * * *.'" *Opinion to the House of Representatives,* 79 R.I. at 280, 87 A.2d at 696.

Mindful that "to tax and to please, no more than to love and be wise, is not given to men,"[8] we have declined to adopt this interpretation. To do so would conflict with our constitution's exclusive allocation to the General Assembly of the legislative power to authorize any city or town to levy, to assess, and to collect local taxes and with the rationale of our earlier decision in *Opinion to the House of Representatives,* which we hereby affirm as it bears on the issues raised by this appeal.

In the famous case of *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), Chief Justice John Marshall spoke to this very point in fixing the distribution of the taxation power between a general and a local governmental authority. In rejecting the State of Maryland's attempt to tax a national bank, Chief Justice Marshall uttered these memorable words:

"That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance, in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied." *Id.* at 431, 4 L.Ed. at 607.

■ In matters pertaining to the authorization of municipal taxation and borrowing, our constitution declares the General Assembly to be supreme over any municipality's attempts to go it alone or to exert control over state legislative initiatives through home-rule measures such as local voter approval. R.I. Const. art. XIII, sec. 5. Thus, pursuant to our advice in *Opinion to the House of Representatives* (a decision rendered just one year after Rhode Island adopted the home rule article), we reaffirm that under the Rhode Island Constitution, the General Assembly retains its plenary power to enact special tax-enabling laws in relation to a particular city or town, notwithstanding that municipality's adoption of a home rule charter. And it can do so without having first to obtain the voters' approval in that home-rule municipality because local tax-enabling acts, like the one at issue here, that affect a city's power to levy, to assess, and to collect property taxes or to borrow money are not subject to article XIII, section 4's requirement of local voter approval.[9]

Given our holding that the Enabling Act is not subject to the local voter-approval provisions of the home rule article because of its status as municipal tax-enabling legislation, there is no need for us to reach any of the other arguments advanced by the parties in

---

8. Edmund Burke, Speech on American Taxation (Apr. 19, 1774), *in* 2 *The Writings & Speeches of Edmund Burke* 67 (1901).

9. Section 4 of the home rule article does provide that "in the case of acts involving the imposition of a tax or the expenditure of money by a town the same shall provide for the submission thereof to those electors in said town qualified to vote upon a proposition to impose a tax or for the expenditure of money." However, because the Enabling Act merely "authorize[s]" the EDC and the city of Providence to enter into a tax treaty on terms that "both the EDC and the City * * * deem advisable," P.L.1995, ch. 400, § 1 (enacting § 42–63.5–3), it does not involve "the imposition of a tax or the expenditure of money by a town, as distinguished from a city * * *." *Opinion to the House of Representatives,* 79 R.I. 277, 280, 87 A.2d 693, 696 (1952). Thus it does not come within the tax-imposition or money-expenditure-by-a-town provision of article XIII, section 4, but instead falls within the General Assembly's reserved section 5–power to authorize particular municipalities to act on local tax matters.

regard to the question of whether this legislation is subject to any of these provisions.

## II

### The Challenged Legislation Does Not Authorize the EDC to Pledge the Credit of the State.

■ We also hold that the Enabling Act does not authorize the EDC to pledge the credit of the state in violation of the Rhode Island constitutional provisions set forth in article VI, section 16 (requiring a majority of the qualified electors of the state to approve state debts over $50,000), nor is there anything in this law that pledges the faith and credit of the state for the payment of the obligation of others.

By law, this type of obligation issued by the EDC under its enabling statute "shall not constitute a debt, liability or obligation of the state or of any political subdivision thereof other than the [EDC] or a pledge of the faith and credit of the state or any political subdivision other than the [EDC]." General Laws 1956 § 42–64–23. We have repeatedly opined that when this or similar disclaimer language is used, debt obligations issued by public corporations like the EDC do not pledge the faith and credit of the state or create a debt enforceable against the state and that, therefore, these public entities are not constitutionally barred from entering into such obligations. *See In re Advisory Opinion to the Governor (DEPCO),* 593 A.2d 943, 950–51 (R.I.1991) (Rhode Island Depositors Economic Protection Corporation); *In re Advisory Opinion to the Governor: Public Drinking Water Protection Act of 1987,* 556 A.2d 1000, 1001 (R.I.1989) (Rhode Island Water Resources Board); *Opinion to the Governor,* 112 R.I. 151, 156–57, 308 A.2d 809, 812 (1973) (Rhode Island Housing and Mortgage Finance Corporation); *Opinion to the Governor,* 107 R.I. 651, 655, 270 A.2d 520, 522 (1970) (Rhode Island Water Resources Board); *see also Advisory Opinion to the Governor,* 113 R.I. 586, 590–91, 324 A.2d 641, 644–45 (1974) (EDC's predecessor, the Rhode Island Port Authority and Economic Development Corporation).

Indeed, in our 1974 advisory opinion concerning the bonds issued by the EDC's predecessor corporation, we concluded that use of the same capital-reserve funding mechanism contained in section 1 of the Enabling Act did not pledge the credit of the state or create a state obligation. *Advisory Opinion to the Governor,* 113 R.I. at 590–91, 324 A.2d at 644–45. We also opined that the mere creation of a capital-reserve-fund provision as described in § 42–64–18(d) "did not constitute the incurring of a debt or pledge of the state's credit because the General Assembly retained its right" to refuse to contribute to any capital reserve fund that may be established by failing to appropriate moneys for this program. 113 R.I. at 591, 324 A.2d at 645.

Our bedrock rationale for all these opinions is that public corporations of the state have "a distinct legal existence from the state and [do not constitute] a department of state government." *See, e.g.,* § 42–64–4(a) (discussing the EDC). Although payments to the Project's developer are to be secured for a term not exceeding twenty years by a so-called capital-reserve fund to be established by the EDC, the General Assembly is under no legal compunction to make any annual appropriation to fund this capital-reserve account, and no creditor can force the state to do so. Thus, because the General Assembly, year in and year out, "still retains its right to concur or disagree" with the proposed funding of this reserve account, the statute "in no way constitutes an unconstitutional incurrence of a debt or a pledge of the state's credit." *See Opinion to the Governor,* 112 R.I. at 157, 308 A.2d at 812; *see also Advisory Opinion to the Governor,* 113 R.I. at 591, 324 A.2d at 645.

Although the state's credit rating as determined by various bonding agencies and financial authorities may well be affected by the level of debt incurred by a public corporation like the EDC and by its capital-reserve-fund provisions that are intended as security for such obligations, these allegations, even if proven, would not convert these public-corporation obligations into state debts or pledges by the state of its faith and credit. This is so because the challenged

provisions neither create any legally enforceable obligation or debt collectible from the state nor pledge as a matter of law the faith or the credit of the state to secure such debts.

In the future, it may well be that as a practical matter (and depending on its then-existing priorities) the General Assembly will be strongly inclined to fund whatever capital-reserve-fund payments are contemplated by the Enabling Act—especially if its failure to do so would adversely affect the state's credit ratings—but "the controlling factor is not whether the legislature will exercise its discretion in a given manner, but rather whether the right of discretion exists." *Opinion to the Governor,* 97 R.I. 200, 206–07, 196 A.2d 829, 832 (1964). Here, that discretion to fund or not to fund plainly exists.

For these reasons we have rejected plaintiffs' argument that the Enabling Act is invalid under article VI, section 16, of the Rhode Island Constitution for not having been approved by voters in a statewide referendum.

## III

### The Challenged Legislation Does Not Improperly Delegate Legislative Power.

■ Section 4 of the Enabling Act (amending § 42–64–20(c)) allows the EDC to authorize its statutory tax exemption to be used by a lessee or sublessee of the corporation's properties.[10] The plaintiffs have argued that this delegation to a public corpora-

tion of the Legislature's power to exempt property from taxation is too broad and standardless to pass legal muster. We disagree.

Before a lessee or sublessee of the EDC can take advantage of these tax-exempt provisions, the EDC must first adopt a resolution that contains the following specific findings: "(1) the project is a project of the [EDC] under R.I. Gen. Laws § 42–64–3(p) and (2) it is in the interest of the [EDC] and of the project that legal title be held by the lessee from the corporation." *See, supra,* note 10. In considering whether to make such findings, the EDC's board of directors is expressly empowered to consider "the interest of the corporation and of the project."

When reviewing the Legislature's delegation of any of its powers, we must interpret the provisions in light of the act as a whole and in conformity with the purposes of the EDC. *See Davis v. Wood,* 427 A.2d 332, 336 (R.I.1981) ("[i]n determining whether a statute contains sufficient standards, we must read the act as a whole; the provision in question should not be isolated, but must be construed with reference to the entire act"). Among the purposes of the EDC are "[t]o promote and encourage the preservation, expansion, and sound development of new and existing industry, business, commerce, agriculture, tourism, and recreational facilities in the state, promoting thereby the economic development of the state and the general welfare of its citizens." Section 42–64–5(c), as amended by 1995, ch. 370, art. 12, § 8. Although the standards for authorizing a tax exemption are broadly drawn, when inter-

---

10. Section 4 of the Enabling Act provides in pertinent part:

"For purposes of the exemption from taxes and assessments upon or in respect of any project under subsections (a) or (b) of this section, the corporation shall not be required to hold legal title to any real or personal property, including any fixtures, furnishings or equipment which are acquired and used in the construction and development of such project, but such legal title may be held in the name of a lessee (including sublessees) from the corporation. Such property, which shall not include any goods or inventory used in such project after completion of construction, shall be exempt from taxation to the same extent as if legal title of such property were in the name of the corporation, provided that the board of

directors of the corporation adopts a resolution confirming use of such tax exemption for such project by such lessee. Such resolution shall include findings that (1) the project is a project of the corporation under R.I. Gen. Laws 42–64–3(p) and (2) it is in the interest of the corporation and of the project that legal title be held by the lessee from the corporation. In adopting any such resolution, the board of directors may consider any factors it deems relevant to the interests of the corporation or the project including, for example, but without limitation, reduction in potential liability or cost to the corporation or designation of the project as a 'Project of Critical Economic Concern' pursuant to Chapter 117 of Title 42 of the General Laws."

preted in light of the EDC's statutory purposes, they serve to guide and to constrain the EDC in the exercise of its authority to permit property held in the name of a lessee or sublessee to be tax exempt (to the same extent as if legal title were held by the EDC).

Moreover, the mere fact that the Enabling Act is contingent on the approval, the execution, and the delivery of specified agreements between the EDC and the Project developer does not impermissibly delegate legislative power. The entry into these agreements is simply part of the process whereby the EDC carries out its delegated powers pursuant to the standards and the purposes set forth in the legislation.

Because we have already twice approved the General Assembly's delegation of powers to the EDC and its subsidiary entities as constitutionally permissible,[11] we need only repeat what we said before: "We see no reason to reexamine this issue * * *." *In re Advisory Opinion to the Governor (Rhode Island Airport Corporation)*, 627 A.2d at 1252.

Here, the function that has been delegated—determining the tax-exempt status of certain economic-development projects—is certainly important but nonetheless narrow. The standards accompanying the delegation are also clear: the project in question must be an EDC project, and it must be in the interest of the EDC and the project that legal title be held by the lessee. These determinations must be made in light of the practical, project-specific considerations that are consistent with EDC's economic-development purposes. And finally, the safeguards provided in the Administrative Procedures Act may, in certain circumstances, serve to check potentially arbitrary EDC action. *See id.* at 1253.

Our approach to legislation like this, which has been challenged for an alleged lack of a proper delegation of legislative authority, is a utilitarian one. We evaluate such challenges in light of the practical recognition that a modern Legislature has a frequent need "to utilize an administrative agent to accomplish the purpose of the legislation * * *." *J.M. Mills, Inc. v. Murphy*, 116 R.I. 54, 61, 352 A.2d 661, 665 (1976). Here, the Enabling Act reflects a legislative decision that the EDC, as an administrative agent, can best decide whether to allow a tax exemption to be used for particular EDC projects in which property is held in the name of a lessee. This is exactly the kind of fact-specific, market-oriented, project-by-project determination in which such a legislative power may be delegated most expediently to an administrative agent, especially when the General Assembly retains the power not to fund the capital-reserve account that secures the Project's debts. In any event we see no constitutional reason to second-guess that legislative judgment.

## Conclusion

We have carefully considered these and each of the other arguments raised by the plaintiffs in their appeal, and we find them to be unpersuasive. Here, there were no material facts in dispute that were outcome determinative.[12] Thus, even in ruling on the defendants' motion to dismiss, *see* Super. R. Civ. P. 12(b)(6), it was proper for the Superior Court to apply a "beyond a reasonable doubt" standard in deciding whether the plaintiffs' challenge to the constitutionality of the Enabling Act should be upheld or rejected. *See, e.g., Chartier Real Estate Co. v. Chafee*, 101 R.I. 544, 565, 225 A.2d 766, 777–78 (1967) (since plaintiffs failed to carry their burden of establishing "beyond a reasonable doubt" that, as a matter of law, certain legislation was unconstitutional, the trial justice did not err in granting defendants' motion to dismiss).

---

**11.** *See In re Advisory Opinion to the Governor (Rhode Island Airport Corporation)*, 627 A.2d 1246, 1252 (R.I.1993); *Advisory Opinion to the Governor*, 113 R.I. at 596, 324 A.2d at 647.

**12.** Even assuming that the plaintiffs would have been able to prove at trial that as a practical matter the financial community, or some significant constituents thereof, may consider the obligations in question to be a pledge of the state's credit or a de facto state debt, this proof would not matter for the purposes of this decision because from a legal standpoint these obligations simply do not fall into that category and no court would be entitled to enforce them as such.

259

For the reasons previously stated, we have affirmed the judgment of the Superior Court and denied and dismissed the plaintiffs' appeal.