**State Senator, The Honorable Eleanor C. SASSO et al.**

v.

**STATE of Rhode Island et al.**

**No. 96–416–Appeal.**

Supreme Court of Rhode Island.

Dec. 6, 1996.

John Marks, Wakefield, J. William Harsch, Washington, DC, for Plaintiff.

Joseph Larisa, Jr., Providence, Lisa Dinerman, Asst. Atty. General, John Kester, Washington, DC, Mark A. Pogue, William P. Robinson, III, Providence, for Defendant.

## OPINION

FLANDERS, Justice.

This case required us to answer a certified question involving the Providence Place Mall Project (the Project)—a proposed Brobdingnagian parking garage and retail-shopping facility "containing no less than 1,150,000 square feet" to be built in downtown Providence. *See* P.L.1995, ch. 400 (Enabling Act). Previously, we rejected a constitutional challenge to the Project's enabling legislation. *See Warwick Mall Trust v. State of Rhode Island,* 684 A.2d 252 (R.I.1996) (*Mall I*) (explaining the court's rationale for its July 19, 1996 order affirming the dismissal of the constitutional claims). And in this case (*Mall II*), we issued an order shortly after oral argument in which we concluded that the Rhode Island Economic Development Corporation (EDC) was authorized to enter into and to ratify the various resolutions, agreements, and other documents necessary to implement the Project.[1]

Two plaintiffs in *Mall I,* Warwick Mall Trust (Warwick Mall) and Bliss Properties, Inc. (Bliss Properties), were also plaintiffs in *Mall II.* They are the owner and the operator, respectively, of a retail shopping mall located in Warwick, Rhode Island. In filing this suit they joined forces with Eleanor C. Sasso and Leonidas P. Raptakis, two state legislators who voted against the Project's Enabling Act.

■ In response to the Attorney General's request, the Superior Court properly certified to us [2] the following question of law: Does the EDC possess the authority to authorize by resolution the execution, delivery, and performance of the various legal agreements and other documents necessary to implement the Project?[3] We now explain briefly the reasons why we responded to this question in the affirmative.

■ The plaintiffs claimed they would suffer harm if the challenged EDC resolutions and agreements relating to the Project were allowed to stand because, contrary to the Enabling Act, they do not require that the Project open and continue to operate

1. *Sasso v. State of Rhode Island,* order No. 96–416–A. (R.I., filed Sept. 12, 1996).

2. The Superior Court certified the question to us pursuant to G.L.1956 § 9–24–27, which, in pertinent part, provides that when a question of law arises that

    "in the opinion of the court, *or in the opinion of the attorney-general,* if the state be a party to such proceeding or if he has intervened therein, is of such doubt and importance and so affects the merits of the controversy that it ought to be determined by the supreme court before further proceedings, the court in which the cause is pending shall certify *such question* or motion to the supreme court for that purpose * * *." (Emphasis added.)

    Although an older version of this section was ruled to be inapplicable in declaratory-judgment actions, *e.g., Rondoni v. Sherman,* 90 R.I. 322, 158 A.2d 267 (1960) (interpreting a version of § 9–24–27 that allowed certification only prior to a trial on the "merits"), we agree with Professor Kent that the current version "clearly encompasses such [declaratory judgment] litigation." 1 Kent, *R.I. Civ. Prac.* § 72.4 at 503 (1969). We also note that this statute requires the Superior or District Court to certify to us any question of law that arises during the proceeding that, in the Attorney General's opinion, "is of such doubt

    and importance and so affects the merits of the controversy that it ought to be determined by the supreme court before further proceedings"—provided (as was the case here) there is a motion or any other specific matter pending before the court that *cannot be determined by the court* without answering the very question that is the subject of the certification request. *See State v. Weiner,* 97 R.I. 506, 199 A.2d 120 (1964) (refusing to answer a certified question when no such motion or matter was pending before the trial court other than the Attorney General's requested certification).

3. We considered the following legal documents and draft agreements relating to the Project that were presented to us as part of the certification request for our review: (1) Resolutions of the Board of Directors of the Rhode Island Economic Development Corporation, Public Session, July 2, 1996; (2) Final Draft, Ground Lease by and between Rhode Island Economic Development Corporation and Providence Place Group Limited Partnership, June 28, 1996; (3) Draft, Deed with Reservations, June 28, 1996; (4) Draft, Fourth Amendment to Sales Agreement, June 27, 1996; (5) Draft, Amtrak Agreement Indemnity, June 28, 1996; (6) Draft, Restoration Guaranty, June 28, 1996; and (7) City of Providence Ordinance, Chapter 1996–1.

throughout its entire ninety-nine-year lease term (plus four optional renewal periods of like duration) with no fewer than 1,150,000 square feet of so-called upscale retail-shopping space and with no possibility of the developer's sooner or later downsizing or changing any portion of the Project's planned retail-shopping use to something else.[4] However, the Project's legal documents tell a different tale. The lease agreement, for example, states that the Project must consist of no less than a "1,150,000 gross square foot 3–level shopping center." It also contains strong disincentives to any changes in size or in use unless the EDC—the public corporation responsible for promoting economic development within the state—consents. Any major changes made without EDC approval will terminate the various public-investment benefits that serve as the economic linchpin of this Project.

The EDC possesses "all powers, authority, rights, privileges, and titles * * * necessary to enable it to accomplish [its] purposes." G.L.1956 § 42–64–4(b). The EDC's ability to agree to provisions that, in limited and defined circumstances and subject to various disincentives, permit commercially reasonable changes in the proposed use and rentable retail space of the Project's property is inherent in its statutory power to manage such ventures responsibly, § 42–64–7(d), and to sell or to lease part of or all of its property "upon such terms" as it sees fit, § 42–64–6(d).[5] If it were not afforded this statutory elbow room in its commercial dealings, the EDC would be unduly hampered in its ability to promote effectively the economic development of the state, § 42–64–4(a), to undertake "all activities in relation thereto," § 42–

64–7(a), and to serve as a viable commercial partner in any economic-development enterprise, § 42–64–6(*l*). Entrepreneurs and businesses would be less willing to enter into binding agreements with an inflexible governmental partner that was unable to accommodate and provide for the normal contingencies that are typically addressed in modern commercial contracts involving a development project of this size and scope. The "machinery of government," Justice Holmes reminds us, "would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Texas v. Pinson,* 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482, 491 (1931). The statutes creating the EDC and the Project's Enabling Act wisely and properly allow for this "play" without dislocating the Project from its legal sockets and without including any rigid use and rentable-square-footage mandates that would hamstring its operational flexibility.

Thus, for example, the Enabling Act's 1,150,000–square–footage requirement is directed to the size of the overall facility and not to how much of its rentable space must be dedicated to so-called upscale retail shopping. As plaintiffs' own mall demonstrates, a commercial venture like this one does not lose its overall character as a retail-shopping facility merely because some of its rentable space may be used for other purposes. Whatever may have been the assumptions in the various studies that were used to explain or to tout the Project to the General Assembly—including those specifying the size of the facility's anticipated rentable retail-shopping space—the Enabling Act, in its wisdom, does not mandate that all 1,150,000 square

---

**4.** One might think that Warwick Mall and Bliss Properties would prefer to face a smaller Providence Place mall rather than encounter this proposed retail leviathan as a commercial competitor. But when we asked about this apparent anomaly at oral argument, plaintiffs informed us that, by insisting that the Project stay as large and as committed to retail shopping as they contend the Enabling Act requires, they were only conforming their litigation tactics to a fundamental business strategy of attempting to keep their future competitor's operating costs as high as possible while limiting the Project's flexibility to adapt its property usage to future changes in market conditions. We shall therefore assume,

without deciding, that plaintiffs possess the requisite standing to bring this action.

**5.** *Compare* G.L.1956 § 42–64–7(b) (any lease by the EDC "may be for such part of * * * [its] property, real or personal, for such period, [and] upon such terms or conditions * * * [as it] shall determine") *with* P.L.1995, ch. 400, § 3 ("[n]otwithstanding the provisions of any general or special law to the contrary, no restriction shall apply to and no further approval, determination or action of any kind shall be required to effect * * * any conveyance" by the EDC of "any interest" in the URI parcel "in connection with the * * * Project").

feet of the facility must inevitably be devoted to upscale retail shopping during the next five centuries of this potential leasehold.

The plaintiffs also posited certain radical change-in-use scenarios involving the Project that, if they were ever to occur, might strain or even subvert one or more of the legislative purposes of the Enabling Act.[6] But we would have been remiss had we allowed these speculative and as yet unrealized concerns about what could or might happen to this Project during the next half of a new millennium to have diverted us from answering the only question that was presented to us. After all, that which is not ripe for decision cannot and should not be decided in a declaratory-judgment action. *See Lamb v. Perry,* 101 R.I. 538, 542, 225 A.2d 521, 523 (1967) (declaratory-judgment act "is not intended to serve as a forum for the determination of abstract questions or the rendering of advisory opinions").

We have carefully considered these and all the parties' other arguments and contentions concerning the validity of the resolutions, agreements, and other legal documents that were before us. Without precluding *ab initio* any further legal challenges to specific future actions involving the Project (but also without inviting or encouraging any such litigation), we have answered the question certified to us in the affirmative and have declared that the EDC possesses the legal authority to authorize by resolution the execution, delivery, and performance of the various agreements and documents that were presented to us for our consideration and that are necessary to implement the Project. Accordingly we remand this matter to the Superior Court for further proceedings consistent with our opinion.

---

6. They contended, for example, that there is nothing in the Project documents to prevent the developer from demolishing its multimillion-dollar facility on day 1 of the lease and converting the area to use as an "open space" or as a "lawn."